COMMONWEALTH of Pennsylvania,
Appellee

v.

Calvin EDWARDS, Appellant.

Superior Court of Pennsylvania.

Submitted May 20, 2013.

Filed June 12, 2013.

Karl Baker, Public Defender, Philadelphia, for appellant.

Hugh J. Burns, Jr., Assistant District Attorney and Daniel L. Blanchard, Assistant District Attorney, Philadelphia, for Commonwealth, appellee.

BEFORE: STEVENS, P.J., PANELLA, J., and COLVILLE, J.*

OPINION BY STEVENS, P.J.

Calvin Edwards (hereinafter "Appellant") appeals from the judgment of sentence entered in the Court of Common

* Retired Senior Judge assigned to the Superior Court.

Pleas of Philadelphia County on December 16, 2009, at which time he was sentenced to an aggregate term of forty-two and one-half (42 ½) years to eighty-five (85) years in prison after he was found to be in violation of the terms of his probation. Upon our review of the record, we affirm.

In its Opinion filed pursuant to Pa. R.A.P. 1925(a), the sentencing court detailed the troubling facts and procedural history in the instant matter, and we incorporate its summary by reference herein. *See* Sentencing Court Opinion, filed April 1, 2010, at 1–9.[1]

On August 19, 2009, Appellant appeared before the sentencing court for a probation violation hearing after he was discharged from Benchmark Behavioral Health Systems (hereinafter "Benchmark").[2] Following the hearing, the sentencing court found Appellant to be in violation of his probation, revoked his probation, and sentenced him to four consecutive terms of ten (10) years to twenty (20) years in prison for one count each of Rape, Robbery, Kidnapping and Involuntary Deviate Sexual Intercourse. He also received a consecutive term of two and one-half (2 ½) years to five (5) years in prison for Possessing Instruments of Crime.[3]

Appellant filed a timely post-sentence motion on August 28, 2009; and the sentencing court scheduled a hearing thereon for December 16, 2009. In an Order entered on September 11, 2009, the sentencing court vacated Appellant's sentence and ordered that Appellant be returned to county custody and held on detainer until his motion to reconsider was heard.

A hearing was held on December 16, 2009, at which time the defense offered Ms. Gillian Blair, Ph.D., as an expert in the field of forensic psychology specifically relating to juveniles. Dr. Blair testified she had an opportunity to evaluate Appellant twice, once in December of 2006 and again in December of 2009. She also reviewed the records of his progress and treatment while at Benchmark. N.T., 12/16/09, at 19–20. Though Dr. Blair admitted that the records revealed Appellant had "a lot of behavioral problems through 2008 and 2009" while at Benchmark, she believed that he had been making some slow, steady progress and beginning to accept responsibility for his behavior until February 2009, when his behavior regressed after he learned of the death of his father. *Id.* at 21–22. Specifically, she stated that "when I saw him just two weeks ago, there was a complete about-face and [ ] he accepted full responsibility for his behavior." *Id.* at 80. She also said that she "didn't think the records are clear about all of his behavioral problems" but stated they did clearly indicate "[h]e had some significant problems." *Id.* at 26.

1. We note that while the sentencing court and the parties' briefs reference various reports about which testimony was given, those reports are not included in their entirety in the certified record. "It is axiomatic that an appellate court is limited to considering only those facts which have been duly certified in the record on appeal and, for purposes of appellate review, what is not of record does not exist." *Law Office of Douglas T. Harris, Esquire v. Philadelphia Waterfront Partners, LP*, 957 A.2d 1223, 1228 n. 2 (Pa.Super.2008) (citation omitted). Nevertheless, we have considered them to the extent to which their contents were summarized or quoted on the record during the August 19, 2009, and December 16, 2009, hearings.

2. The record reveals that Benchmark is a residential sexual offender program located in Utah which provides treatment to sexual offenders with a low Intelligence Quotient. N.T., 9/19/09, at 13, 31.

3. 18 Pa.C.S.A. § 3121(a)(1); 18 Pa.C.S.A. § 3701(a)(1)(ii); 18 Pa.C.S.A. § 2901(a)(2); 18 Pa.C.S.A. § 3123(a)(1); 18 Pa.C.S.A. § 907(a), respectively.

Among the problems Dr. Blair mentioned were that he was posturing, threatening, noncompliant, and intimidating to some of the younger children, and that he failed to take things seriously. She also noted he engaged in what he called "sexual horseplay" with another boy. *Id.* at 26–27.

Dr. Blair further explained Appellant, one of five children, had parents who struggled with mental illness. His father, now deceased, had had a cocaine addiction, and his siblings suffered from serious medical and psychiatric problems. Appellant himself had been diagnosed at a young age with learning disabilities and ADHD. *Id.* at 29–30. Dr. Blair concluded that the difficulty in the assessment of risk and rewards and in managing emotion along with an increase in risk-taking and trouble with cognition and decision-making which characterized Appellant's behavior at Benchmark are behaviors of a "typical adolescent." *Id.* at 41.

On cross-examination, Dr. Blair acknowledged that the attempted rape of October 20, 2006, and the actual rape of October 25, 2006, to which Appellant admitted were not normal adolescent behavior and placed him in a category that was "maybe not the most severe subgroup" of delinquent behavior. *Id.* at 43. She also agreed that Appellant either at that time or in the past fit the DSM–IV criteria[4] for conduct disorder. *Id.* at 47. Dr. Blair agreed that since he was thirteen years old, Appellant consistently had been in a placement facility which was either a juvenile program, a group home, a residential treatment facility, a very specific sex offender program, or a county prison or state correctional institution. *Id.* at 52–53.

The Commonwealth questioned Dr. Blair concerning Appellant's extensive violent and sexual behaviors at these institutions, as well as the two incidents that occurred in October of 2006. Dr. Blair admitted she was not aware of the details pertaining to several of these occurrences. *Id.* at 53–62. She disagreed with Dr. Zakireh's report of 2006 wherein he had indicated a diagnosis of paraphilia could not be totally ruled out at that time to the extent that she did not deem Appellant's attacks of the women could fall into the category of a carefully planned out assault. *Id.* at 74–77. She also believed the report was biased and/or incomplete because it was prepared without Dr. Zakireh having had any contact with Appellant. *Id.* at 78.

Nevertheless, Dr. Blair admitted that Benchmark conducted an informed, clinical assessment of Appellant after two years of treatment which placed him in the highest category of risk for violence and in some cases indicated "not that a sexual criminal behavior may occur, but rather that a sexual criminal behavior will occur in the next seven years if [Appellant] is released into the community." *Id.* at 95. Dr. Blair also was reminded that at the Megan's Law hearing held before the sentencing court, Dr. Ziv testified that though she had never stated as much in court before, she believed "not that [Appellant] was likely to commit an offense, but that he will commit another offense." *Id.* at 96.

After hearing testimony and argument of counsel, the sentencing court indicated on the record that it typically attempts to find creative ways not to impose mandatory sentences[5] and to provide second chances to a defendant when they are available. *Id.* at 119. Following a detailed

---

**4.** Refers to the *Diagnostic and Statistical Manual of Mental Disorders.*

**5.** The sentencing court is reminded of the legislative purpose behind mandatory sentences and should not be seeking "creative" ways to avoid imposing statutory law.

explanation which spanned seven pages of the transcript, the sentencing court denied Appellant's Motion to Reconsider Violation of Probation Sentence and reinstated the sentence of forty-two and one-half (42 ½) to eighty-five (85) years in prison which it had imposed on August 19, 2009. N.T., 12/16/09, at 119–125.

Appellant filed a timely Notice of Appeal on December 18, 2009. The trial court did not order, and Appellant did not file, a statement pursuant to Pa.R.A.P. 1925(b). The sentencing court filed its Opinion pursuant to Pa.R.A.P. 1925(a) on April 1, 2010.

In his brief, Appellant raises three questions for our review:

1.  Did not the sentencing court violate the requirements of § 9771(c) of the Sentencing Code when, after revoking his probation, it sentenced [A]ppellant to a period of total confinement where: a) he had not been convicted of or charged with a new crime, b) the record did not demonstrate any likelihood that he would commit a new crime if not incarcerated, and c) incarceration was not essential to vindicate the authority of the court?

2.  Was not the lower court's imposition of a forty-two and one-half (42 ½) to eighty-five (85) year sentence of incarceration on a juvenile for technical violations of probation, manifestly excessive and an abuse of discretion where the court failed to give individualized consideration to [A]ppellant's personal history, rehabilitative needs or background, and without explaining how, as a matter of law, this sentence was the least stringent one adequate to protect the community and to serve the rehabilitative needs of the [A]ppellant?

3.  Did not the trial court err and abuse its discretion by sentencing [Appellant] to an excessive period of incarceration?

Brief for Appellant at 4. We will consider these issues in turn.

■ Appellant first claims that the sentencing court violated 42 Pa.C.S.A. § 9771(c) [6] when sentencing him to a total period of incarceration after revoking his probation. Appellant argues he had not been convicted of or charged with a new crime and that the record did not demonstrate either that he would likely commit a

---

**6.** 42 Pa.C.S.A. § 9771 entitled Modification or revocation of order of probation reads as follows:

(a) **General rule.**—The court may at any time terminate continued supervision or lessen or increase the conditions upon which an order of probation has been imposed.

(b) **Revocation.**—The court may revoke an order of probation upon proof of the violation of specified conditions of the probation. Upon revocation the sentencing alternatives available to the court shall be the same as were available at the time of initial sentencing, due consideration being given to the time spent serving the order of probation.

(c) **Limitations on sentence of total confinement.**—The court shall not impose a sentence of total confinement upon revocation unless it finds that:

(1) the defendant has been convicted of another crime; or

(2) the conduct of the defendant indicates that it is likely that he will commit another crime if he is not imprisoned; or

(3) such a sentence is essential to vindicate the authority of the court.

(d) **Hearing required.**—There shall be no revocation or increase of conditions of sentence under this section except after a hearing at which the court shall consider the record of the sentencing proceeding together with evidence of the conduct of the defendant while on probation. Probation may be eliminated or the term decrease without a hearing.

42 Pa.C.S.A. § 9771.

new crime if he is not incarcerated or that incarceration was necessary to vindicate the sentencing court's authority. Brief for Appellant at 11. Appellant maintains that "his problems and his resulting technical violations of probation flowed more from immaturity rather than criminal conduct" and "the court at sentencing made no finding that [Appellant] was likely to commit a new crime." *Id.* at 17. Appellant further asserts Appellant's sentence is effectively a life sentence, which under the circumstances presented, is expressly prohibited by 42 Pa.C.S.A. § 9771(c). *Id.* We review this issue under the following, well-settled standard of review:

In general, the imposition of sentence following the revocation of probation is vested within the sound discretion of the trial court, which, absent an abuse of that discretion, will not be disturbed on appeal. *Commonwealth v. Sierra*, 752 A.2d 910, 913 (Pa.Super.2000). Our standard of review is limited to determining the validity of the probation revocation proceedings and the authority of the sentencing court to consider the same sentencing alternatives that it had at the time of the initial sentencing. 42 Pa.C.S.A. § 9771(b); *Commonwealth v. Gheen*, 455 Pa.Super. 499, 501, 688 A.2d 1206, 1207–08 (1997) (the scope of review in an appeal following a sentence imposed after probation revocation is limited to the validity of the revocation proceedings and the legality of the judgment of sentence). Once probation has been revoked, a sentence of total confinement may be imposed if any of the following conditions exist: (1) the defendant has been convicted of another crime; or (2) the conduct of the defendant indicates that it is likely that he will commit another crime if he is not imprisoned; or, (3) such a sentence is essential to vindicate the authority of court. 42 Pa.C.S.A. § 9771(c); *Com-*

*monwealth v. Coolbaugh*, 770 A.2d 788, 792 (Pa.Super.2001).

*Commonwealth v. Hoover*, 909 A.2d 321, 322–323 (Pa.Super.2006).

Herein, there is no question that Appellant was not convicted of another crime after his probation had been revoked, and a probation violation hearing was held on September 19, 2009, at which time the sentencing court heard argument regarding Appellant's troubled past and his behavior while at Benchmark. Mr. Michael Gagliardi, a Philadelphia County Adult Probation/Parole Officer with the Sex Offender's Unit, also briefly testified. Mr. Gagliardi stated that at any given time, he has approximately one hundred thirty men in his caseload, the majority of whom are Megan's Law offenders. Though he had never met Appellant in person before the date of the hearing, he considered Appellant to be "just on paper the worse [sic] guy I have in my caseload" and explained that is was apparent to him "that he has a hard time on the outside and has a hard time doing what's expected of him while on the inside at Benchmark." N.T., 9/19/09, at 32. He ended his testimony by stating Appellant "needs to be away." *Id.* Appellant also spoke to the sentencing court where he attempted to explain his behavior as being "playful" and reflecting his desire to be "a jokester" and asked the sentencing court to provide him with "another chance." *Id.* at 33–34.

Despite his contention that the sentencing court made no finding Appellant was likely to commit a new crime, prior to imposing Appellant's sentence, the sentencing court explained its reasons for fashioning it as follows:

I don't see any scenario in which it is possible to release [Appellant] from very restrictive custody for as long as we could possibly maintain his custody.

I've read the reports over the years. I've read the discharge summary, which is shocking the extent to which it details [Appellant's] pathology and his unwillingness or his inability to change. Over the time I've seen the steady recitation of violence, inappropriate behavior, sexually inappropriate behavior toward everyone he's come in contact with. And what I see here fits the pattern of the evaluations that we have seen ever since [Appellant] was very young.

I don't know what happened in this young man's childhood. I'm sure it was quite dreadful. And I'm really sorry that we have not been able using the best resources we had at hand to undo the damage. But I am absolutely convinced that [Appellant] on the street will commit more violence to anyone around him, and certainly sexual violence upon women, and so I am revoking probation.

On Bill Number 1, Rape, Forcible Compulsion, Felony 1, I'm imposing a sentence of 10 to 20 years. Bill Number 2, aside from Number 1, a consecutive 10 to 20 years. Robbery, that's Bill Number 8, Felony 1, a further consecutive 10 to 20 years. Bill Number 16, Kidnapping, Felony 1, a further consecutive 10 to 20 years. And on Possession of an Instrument of Crime, Bill Number 11, Misdemeanor 1, a further consecutive 2 and a half to 5 years.

In over 20 years as a judge, I have never imposed a sentence that severe on someone this young. I do it with no pleasure, but with a great deal of sorrow. But as I said I am absolutely convinced that [Appellant] has demonstrated over the several years that he's been in the court system that he is violent, unable and/or unwilling to control his violence and remains a serious danger to those around him both within the custodial system and without.

N.T., 9/19/09, at 35–37. The concern over Appellant's situation that the sentencing court expressed on the record on September 19, 2009, is reflected in the fact that it granted his request for reconsideration of that sentence and held another hearing on December 16, 2009.

In its Opinion, the sentencing court further stressed that "[t]he facts of the instant case presented [it] with one of the most compelling justifications for a long sentence of total confinement it has ever seen in more than twenty years on the bench[,]" and reiterated the reasons it had imposed Appellant's lengthy sentence. Sentencing Court Opinion, filed 4/1/10, at 11–13. The sentencing court also found it noteworthy that despite Dr. Blair's testimony that when she had recently interviewed Appellant in December of 2009, Appellant did not display anger or assign blame to others for his situation in life, Appellant engaged in the following outburst on the record after the sentencing court had denied his motion for reconsideration of sentence and advised Appellant of his appellate rights:

Yea. I think it's racist. And because I seen most of the time—like, if I was a white person, it would have been a different story. Like, you see in my reports that it says that I have problems. It also says in there that I was going to get discharged in there successfully, before they kicked me out. And it says that when I came back to go to the court, you wasn't my judge. I had Woods–Skipper, whoever that was, and somebody switched me back to you.

I seen last time when I was there, you didn't like me because when I told you— the first time that I saw you, I told you that I didn't want to listen. I held back a lot of things just to try to please you, so I could get back to my family. You don't give a shit. Commonwealth vs. Ed-

wards. You want people to be nice and kind with you and whatnot. We try to do that, but you don't understand the environment that we come from. All you think is we're wild animals and everything else.

Like, as I said, the first time you checked in the Philadelphia counties— like, look at the majority of the people that is there, they are all black inmates. That's your fault. You don't see no white people there. In my county, there is one white inmate in my unit. That's how it is in the whole jail.

Sentencing Court Opinion, 4/1/10 at 12–13 citing N.T., 12/16/09, at 125–126.

In light of the foregoing and upon our review of the record, we find the trial court did not abuse its discretion in imposing Appellant's sentence following its revocation of his probation; thus, we will not disturb it herein.

Appellant's second issue raised on appeal concerns whether the trial court sentenced Appellant to a manifestly excessive period of incarceration without properly considering his personal history or rehabilitative needs or explaining how that sentence adequately protects the community and serves his rehabilitative needs. Specifically, Appellant maintains that in sentencing Appellant, a juvenile, to 42 ½ to 85 years in prison after a revocation of probation for technical violations, the sentencing court violated 42 Pa.C.S.A. § 9721(b) [7] in failing to follow the general principle that the sentence imposed should call for confinement that is consistent with the protection of the public, the gravity of the offense and Appellant's rehabilitative needs Brief for Appellant at 7–8. Appellant further argues that "the lower court in the present case seems to exclusively focus on the seriousness of the underlying crimes rather than taking into consideration [A]ppellant's abysmal family history." Id. at 19.[8]

■ Initially, we note that this claim concerns the discretionary aspects of Appellant's sentence. "It is well settled that, with regard to the discretionary aspects of sentencing, there is no automatic right to appeal." Commonwealth v. Mastromarino, 2 A.3d 581, 585 (Pa.Super.2010) (citation omitted).

Before we reach the merits of this [issue], we must engage in a four part analysis to determine: (1) whether the appeal is timely; (2) whether Appellant preserved his issue; (3) whether Appellant's brief includes a concise statement of the reasons relied upon for allowance of appeal with respect to the discretion-

---

7. This statute provides, in relevant part, that the sentencing court:

shall follow the general principle that the sentence imposed should call for confinement that is consistent with the protection of the public, the gravity of the offense as it relates to the impact on the life of the victim and on the community, and the rehabilitative needs of the defendant. The court shall also consider any guidelines for sentencing and resentencing adopted by the Pennsylvania Commission on Sentencing and taking effect under section 2155 (relating to publication of guidelines for sentencing, resentencing and parole and recommitment ranges following revoca-

tion). In every case in which the court imposes a sentence for a felony or misdemeanor, modifies a sentence, resentences an offender following revocation of probation, county intermediate punishment or State intermediate punishment or resentences following remand, the court shall make as a part of the record, and disclose in open court at the time of sentencing, a statement of the reason or reasons for the sentence imposed.

42 Pa.C.S.A. § 9721(b).

8. Appellant does not challenge the legality of the individual sentences which comprise his aggregate sentence or the fact that those sentences were imposed consecutively.

ary aspects of sentence; and (4) whether the concise statement raises a substantial question that the sentence is appropriate under the sentencing code.· The third and fourth of these requirements arise because Appellant's attack on his sentence is not an appeal as of right. Rather, he must petition this Court, in his concise statement· of reasons, to grant consideration of his appeal on the grounds ·that there.is a substantial question. Finally, if the appeal satisfies each of these four ·requirements; we will then proceed to decide the substantive merits of the case.

*Commonwealth v. Austin,* 66 A.3d 798, 808 (Pa.Super.2013) (citation omitted).

In the instant case, Appellant filed a timely notice of appeal, preserved his claims in his timely post-sentence motion, and included in his appellate brief a separate Rule 2119(f) statement. As such, he is in technical compliance with the requirements to challenge the discretionary aspects of a sentence. *Commonwealth v. Rhoades,* 8 A.3d 912, 916 (Pa.Super.2010), *appeal denied,* 611 Pa. 651, 25 A.3d 328 (2011), *cert. denied, Rhoades v. Pennsylvania,* — U.S. ——, 132 S.Ct. 1746, 182 L.Ed.2d 536 (2012). Thus, we proceed to determine whether Appellant has presented a substantial question that the sentence appealed from is not appropriate under the Sentencing Code. *See Austin and Mastromarino, supra.*

The determination of what constitutes a substantial question must be evaluated on a case-by-case basis. *See Commonwealth v. Paul,* 925 A.2d 825 (Pa.Super.2007). "A substantial question exits only when the appellant advances a colorable argument that the sentencing judge's actions were either: (1) inconsistent with a specific provision of the Sentencing Code; or (2) contrary to the fundamental norms which underlie the

sentencing process." *Commonwealth v. Griffin,* 65 A.3d 932, 935 (Pa.Super.2013) ·(quotation ·and quotation marks omitted).

*Austin, supra,* at·808.

A panel of this Court has determined an allegation that the sentencing court "failed to consider" or "did not adequately consider" various· factors does not raise a substantial question that the sentence was inappropriate. *Commonwealth v. Dunphy,* 20 A.3d 1215, 1222 (Pa.Super.2011). As such, we find that Appellant did not raise a substantial question on this claim; however, assuming, *arguendo,* that he had and we were to ·reach the merits of this issue, for the reasons set forth below, we would find the sentencing court did not abuse its discretion.

■ Appellant lastly argues the sentencing court abused its discretion in sentencing Appellant to a "manifestly unreasonable, disproportionate and excessive sentence." Brief for Appellant at 20. Appellant relies upon *Commonwealth v. Coulverson,* 34 A.3d 135 (Pa.Super.2011) wherein a panel of this Court vacated a judgment of sentence· of eighteen (18) to ninety (90) years which the defendant, age nineteen, received following a three-day violent crime spree.

In prior cases, this Court has concluded that claims of excessiveness may be justifiable as substantial questions based on the circumstances of the case and the extent to which the appellant's Rule 2119(f) statement suggests the trial court's deviation from sentencing norms. *See Commonwealth v. Coulverson,* 34 A.3d 135, 143 (Pa.Super.2011) citing *Commonwealth v. Perry,* 883 A.2d 599, ·602 (Pa.Super.2005) (concluding that an appellant's averments of excessiveness of sentence raised a substantial question where the trial court had couched its reasons for the sentence imposed in

terms of the seriousness of the offense and victim impact without taking into consideration his expressions of remorse, desire to make restitution, and lack of a prior criminal record). *Commonwealth v. Hill,* 66 A.3d 365, 369 (Pa.Super.2013). As such, we will consider the merits of this issue below.

In *Coulverson,* this Court noted that the sentence of two years' to twenty years' incarceration which had been imposed on an aggravated indecent assault count was illegal and subject to *vacatur.* With regard to the remaining portion of the defendant's sentence, we stressed that the sentencing court's application of the Sentencing Guidelines was not at issue, and found that the trial court's discussion in support of the sentence had been minimal in that "[i]t did not expound on the specific sentencing factors but instead premised the sentence imposed on testimony adduced primarily from the rape victim, her family and friends." *Coulverson,* 34 A.3d at 144. This Court further stated it was "troubled by the court's cursory treatment of so weighty a matter, as the 90–year aggregate maximum potentially consigns a 19-year-old defendant with mental health problems to life in prison without even a nod to relevant sentencing factors." *Id.* at 146. Finding the circumstances of the case to be akin to those in *Commonwealth v. Dodge,* 957 A.2d 1198 (Pa.Super.2008), *appeal denied,* 602 Pa. 662, 980 A.2d 605 (2009) [9], this Court found "the record reveals scant consideration of anything other than victim impact and the court's impulse for retribution on the victims' behalf." *Id.* at 148.

To the contrary, the sentencing court in the matter *sub judice* had the benefit of numerous behavioral reports and expert testimony regarding Appellant's likelihood to reoffend. It held a violation of probation hearing and engaged in a lengthy discussion on the record in support of its sentence. It held a second hearing to reconsider its sentence, after which it, once again, heard testimony and detailed on the record its reasons for denying the motion.

Recently, in concluding the trial court's imposition of consecutive sentences which resulted in an aggregate sentence of 35 years to 70 years in prison did not present a substantial question, this Court stated that even had the appellant raised a substantial question, we would not find that it abused its discretion in imposing the sentence. We further stated that, on its face, such a sentence did not constitute a guaranteed life sentence for a presently twenty-eight year old appellant. *Commonwealth v. Austin,* 66 A.3d 798, 807 (Pa.Super.2013). Therein, a panel of this Court had decided the trial court abused its discretion in sentencing the appellant, a twenty-five year old at the time, and vacated his original sentence of 72 to 192 years in prison following his convictions of 96 counts of sexual abuse of children (possession of child pornography). Upon remand, the trial court resentenced the appellant, and the appellant appealed claiming his new aggregate sentence of 35 years to 70 years also was manifestly excessive and an abuse of the trial court's discretion.

In affirming that sentence, this Court noted that the trial court had available to it expert reports which indicated, *inter alia,* that the appellant was a "high risk offender," had psychological issues, functioned on the level of an adolescent, behaved in a "resistant pattern of sexual

**9.** It is noteworthy that the author of the instant Majority Opinion, President Judge Stevens, filed a Dissenting Opinion in *Dodge;* however, until our Supreme Court overrules the Majority in *Dodge,* this Court continues to be bound by its holdings. *See also Austin, supra,* at 801 n. 2.

deviation" that "would not be easy to reha- bilitate," and showed a lack of remorse. We also stressed that the trial court had determined the appellant's history of promiscuity and reckless behavior support the notion he is likely to re-offend and that the facts revealed the appellant's behavior was characterized by a "resistant pattern of sexual deviation" which would not be easy to rehabilitate. *Austin, supra,* at 804. The trial court ultimately concluded it would be "absurdly irresponsible" of it to fail to consider the totality of the offender. *Id.*

Similarly, the sentencing court herein heard ample testimony and reviewed numerous documents which led it to conclude the sentence imposed was justifiable and necessary in this case. Having reviewed the record, we find no error.

Judgment of sentence affirmed.

COLVILLE, J. Concurs in the Result.

EXHIBIT "A"

Pa.Com.Pl.,2010.

COMMONWEALTH OF PENNSYLVANIA

v.

Calvin Edwards

No. CP–51–CR–00025782007

Court of Common Pleas of Pennsylvania,

First Judicial District, Trial Division—Criminal Section.

April 1, 2010.

OPINION

This is an appeal from a judgment of sentence entered on December 16, 2009.

For the reasons that follow, the judgment of sentence should be affirmed.

On August 19, 2009, the lower court found the seventeen-year-old defendant to be in violation of the terms of his probation when he was expelled from The Benchmark program for juvenile sexual offenders.[1] The court imposed a sentence of forty-two and one half to eighty-five years' imprisonment. Due to the serious implications of sentencing a youthful offender to such a long term of imprisonment, the lower court granted reconsideration at the request of the defense, and vacated the sentence on September 10, 2009. After a lengthy hearing on December 16, 2009, during which the court entertained expert testimony from the defense and numerous written evaluations of the defendant, the lower court was constrained to impose the same sentence.[2] This appeal followed.

The sentencing code provides:

In selecting from the alternatives set forth in subsection (a)probation, partial or total confinement, fine, intermediate punishment, the court shall follow the general principle that the sentence imposed should call for confinement that is consistent with the protection of the public, the gravity of the offense as it relates to the impact on the life of the victim and on the community, and the rehabilitative needs of the defendant.

PA Sentencing Code 42 Pa.C.S. § 9721(b)

The instant case presents a disquieting set of facts that support the court's decision. The defendant, despite his youth, is

1. Benchmark is a secure, residential treatment program for intellectually challenged juvenile sex offenders located in Woods Cross, Utah.

2. The defendant was sentenced to consecutive terms of ten to twenty years imprisonment for rape, 18 PA C.S. 3121 Al, EDSI., 18 PA C.S. 3123, Robbery 18 PA C.S. 3701 A1ii.

beyond the point where he can be rehabilitated and live in society without posing a constant danger to those around him. The fact that the he was in the Benchmark residential program for youthful sexual offenders from 2007 until his expulsion in June 2009 presented the court with a rare opportunity to review his daily conduct over a two-year period through regular progress reports generated while he was there. The evidence of record indicates that he is almost certain to continue inflicting sexually predatory and violent behavior on random members of the community. The only realistic way to protect society is to confine him where he cannot harm the public.

*Background*

The defendants behavioral problems began when he was four and diagnosed with ADHD. When he was five, he set a blanket on fire. When he was eleven, he was caught defacing merchandise in a store. He was a chronic truant and a runaway, and was expelled from middle school for disruptive behavior that included bullying and fighting. His mother was unable to handle him and sought placement repeatedly. He had a poor adjustment to placement, ran away from facilities, and acted aggressively toward peers and authority figures. He resisted treatment and attempts to help him.

Defense witness Gillian Blair, Ph.D. submitted a report at the reconsideration hearing in which she stated that the chaos in the defendant's family life and ineffective parenting exacerbated his problems. (*Report of Gillian Blair, Ph.D.*, December 13, 2009 at 6.) His father was a drug addict who was incarcerated much of the time.[3]

His mother suffers from depression. The defendant's youngest sister functions at a four-year-old level, and has cerebral palsy. One of his older sisters abused drugs, and another sister has a colostomy due to Crohn's disease. An older brother also has Crohn's disease. Psychological Evaluation, Michael Schuman, Ph.D., November 4, 2004 at 3. Evidence from a DHS investigation indicated that the defendant's youngest sister had been sexually abused. While DHS could not rule out that the defendant sexually abused his sister at some point, no charges were filed. His sister was eventually placed in foster care. *Amenability Hearing*, 2/15/07 at 101–117.

The defendant's official criminal history began when he was twelve and was adjudicated delinquent of burglary and related offenses. While he was in juvenile placement at the St. Francis Group Home, he was charged with sexually assaulting an eleven-year-old boy. He was expelled from that placement and was later was acquitted of the assault charges for reasons not made available to the lower court. He was moved to the Blackwell Center where he remained eleven more months. When he was released, he received counseling and support services from the DHS Reti–Wrap program to facilitate his re entry into the public school system. Marisa Johnson, a social worker assigned to assist the defendant at this time, testified that while she was attempting to complete paperwork with him during a home visit, she looked up and saw him pointing a gun at her. She realized it was a toy gun and took it from him. *Amenability Hearing*, N.T. 2/15/07 at 86–87.[4] While walking home *on the very day he finished the program*, lie attempted to rape a sixteen-

---

**3.** His father was murdered while he was in the Benchmark program.

**4.** He later denied that this happened and laughed about it. His father downplayed the incident. Psychiatric Addendum. of E.J. Thomas M.D. 11/13/10 at 2.

year-old female stranger at gunpoint. *Amenability Hearing,* N.T. 2/15/07 at 21–32; 12/16/09 at 57. He was then fourteen years of age.[5] Five days later, he dragged a twenty-one year old college student into a secluded area at knifepoint, robbed her, raped her orally and vaginally, threatened to kill her, and tied her to a fence before he fled. N.T. 2/15/07 at 37–51.

Barry Zakireh, Ph.D. assessed the defendant's risk of sex offense recidivism with the Juvenile Sex Offender Assessment Protocol–II (J–SOAP–II) and concluded that the defendant scored in the high-risk profile in all four domains assessed by the scale. (Sexual Drive/Preoccupation. Impulsive/Antisocial Behavior, Intervention Scale, and Community Stability/Adjustment Scale.) (*Zakireh Report,* January 15, 2007 at 8.) Dr. Zakireh found it relevant that the defendant's behavioral problems started when he was four, that he continued to deny any tendency toward sexually assaultive behavior, and that he had a poor response to legal sanctions, supervision, structured intervention or treatment. *Id.* at 5–6. These factors led Dr. Zakireh to conclude that the defendant's pattern of behavior was "life course persistent" rather than limited to adolescence, *Id.* at 7 and that he posed a significant long-term risk, and would require supervision well into his adulthood. "in fact," Dr. Zakireh concluded, "it is evident that early behavioral problems have likely *worsened* . . . and escalated into more severe and varied forms *despite significant legal sanctions, supervision, monitoring, confinement and treatment."* *Id.* at 11–12. (emphasis added.)

The defendant waived certification in the case involving the college student and, on March 14, 2007, entered a negotiated guilty plea before the lower court to rape, 18 Pa.C.S. 3121, robbery, 18 Pa.C.S. 3701, kidnapping, 3921, IDSI 18 Pa.C.S. 3123, and PIC, 18 Pa.C.S. 907. On September 14, 2007, he was found to be a sexually violent predator after a Megan's Law hearing and was sentenced pursuant to the terms of a plea agreement to five years' probation on the PIC bill and concurrent terms of fifteen years' probation on the remaining bills. He filed a direct appeal after his motion to declare Megan's Law unconstitutional was denied by operation of law, but he withdrew the appeal on October 31, 2008.

Dr. Barbara Ziv evaluated the defendant and testified at his Megan's Law Hearing that based on his history, she was of the opinion that either his conduct disorder caused a problem with volitional control or that he "made a conscious decision to overcome whatever volitional control he has." N.T. 9/14/07 at 23. She concluded that in light of his history and failed treatment, that he possessed traits associated with high recidivism. *Id.* at 25.

> One of the reasons you can't give a diagnose of personality disorder by the DSM IV in adolescence, we all know adolescent people can change. So for example adolescence sex offenders have variable outcomes because it depends on your amenability to treatment, and a lot of other things influence you between being an adolescent and being an adult. However, in the case of—somebody in the case of Mr. Edwards, who we are here to talk about, from the age of 12 or possibly preceding that but certainly since he has been known to the juvenile justice system and criminal justice system and all of agency he's been referred,

---

**5.** He later pled guilty to this charge in juvenile court. Before the conclusion of a two-day certification hearing before the Honorable Richard Gordon, the Commonwealth and defense agreed to give the court hybrid jurisdiction over the defendant until he was thirty.

[sic] he has a persistent pattern, he has deviated·from nor [sic] any periods of time that he has been antisocial and aggressive and violent and threatening and has not demonstrated any interest in treatment as defined by the people who are currently treating him. This is despite the fact he has been incarcerated despite the fact he has had repercussion for his behavior. There's not even a shred of something you can hold onto. You can't say well he behaves badly in these circumstances. but here's an instance. here's an environment where he puts forth some effort, not in school in the treatment.

He has so little concern about it, he's not even faking it while in treatment. He's behaving in a way that is ensuring that people—that his treaters consider him to be a high risk ... [H]e has not made measurable progress during his five months stated here at Benchmark and continues to refuse treatment of any kind.

*Id.* at 19–20.

E.J. Thomas. M.D. who·evaluated the defendant on three occasions, stated in a report dated January 2.2007 that his behavior indicated the possibility of a "deep and chronic psychopathology." (*Report of El. Thomas. M.D.* at 8.) Dr. Barry Zakireh's report concluded that the defendant posed a significant risk to public safety, that he needed treatment and supervision, and that his problems were so severe that they could not be alleviated by his twenty-first birthday. (*Report of Barry Zakireh* at 11.)

The defendant had many behavioral problems and tried to run away from Benchmark during his first stay there—At the time of the Megan's Law Hearing, it was not known whether Benchmark would let him return. NT 9/14/07 at 15.

His attorney argued:

Once again one of the few things that is truly reliable and we can bank on is adolescents change with amazing rapidity and [sic] adolescent limited offenses were bad·adolescent offenses don't mean bad adult offenses.

*Id.* at 82.

Because of his youth and the willingness of the Benchmark program to readmit him, the lower court accepted the negotiated plea. It required that he cooperate with and complete the Benchmark program as a condition of his probation. Status hearings held throughout 2008 indicated that the defendant was making little, if any progress.[6] He was finally expelled from the Benchmark program in June 2009 because of persistent, atrocious conduct and failure to cooperate with treatment.

Toward the end of his stay, several Benchmark residents reported that the defendant had threatened to violate them sexually when they were sleeping. He was a bully, violent and disruptive, and created an environment of fear. After 25 months of intensive treatment, the staff concluded that he had created "an unsafe environment that was toxic to the well being and safety of the other patients." (*Letter of June 10, 2009, Rebecca Turkanis, CSW*), NT 12/16/09 at 85.

His progress reports from 2007 are replete with incidents of disruptive, violent, and sexualized behavior. The incidents described include taunting staff about having sex with their mothers and sisters, telling staff he wanted a female staff member to come to his room so he could "bone"

---

6. The·defendant appeared to make some progress with his schoolwork when he was not disrupting classes. His functional I.Q. is approximately 75.

her, getting into a fistfight with another patient, and entering another patient's room and punching him in the face several times. The reports stated that he showed a "remarkable lack of remorse for harm done to others as a result of his anti-social behavior". (August Progress Report 9/5/2007 at 6.)

His primary therapist, Sue Villani, M.S. LMFT, wrote an addendum to his August 2007 progress report in which she stated that he posed a danger to other youth, and should be placed in a more restrictive environment. This is alarming considering that he was *already* housed in a secure residential treatment program for juvenile sexual offenders.

His progress reports from 2008 and 2009 showed no significant improvement. Each month's report contained instances where the defendant threatened peers and staff, disrupted group therapy sessions and required physical restraint for his own safety or the safety of others. He used foul language, refused to follow directions, and created disturbances in class and at bedtime. On occasion, he physically assaulted staff and other residents. (See, e.g. April, October and December 2008 Progress Reviews). He began stealing from teachers. (August, October and December 2008 Progress Reviews). In November 2008, he broke a teacher's desk and threatened the teacher. (November 2008 Progress Review). In December 2008, he hit another resident in the face, threw a chair, and carried on his disruptive bedtime behavior through the night. (December 2008 Progress review). His Progress reviews indicate that his behavior started to worsen in 2009. He began stealing from the other residents, bullying them and trying to coerce them into committing violent acts against staff. He made inappropriate sexual comments to a female staff member and tripped another staff member. (February 2009 Progress Review). In March 2009, he stole a set of keys and left the hospital grounds. When a police officer apprehended him in a local town, he physically resisted. (March 2009 Progress Review). By April 2009, he was exhibiting increased sexualized behavior with female staff, and continuing his course of bullying and assaulting residents. (April 2009 Progress Review).

Throughout this time, the reports consistently state that he showed a lack of empathy and blamed others for his problems, but also noted that he was also capable of acting appropriately when he chose. Most troubling, he was still unable to address sexual offender treatment in his therapy sessions. (May 2009 Progress Review) He was expelled in June 2009.

At the time the lower court sentenced the defendant to probation he had the earmarks of a serial rapist, and was already classified as a sexually violent predator. Instead of improving with treatment, he grew worse; he relentlessly subjected the Benchmark staff to violence, threats, and harassment and he terrorized his fellow sexual offenders. Most alarmingly, this occurred in a secure setting under the close supervision of staff specially trained to help juvenile sexual offenders. At the defendant's Megan's Law hearing, Dr. Barbara Ziv was not certain whether the defendant lacked volitional control or chose not to control his behavior, N.T. 9/14/07 at 23. Two years later, his treatment team at Benchmark concluded that he was indeed capable of controlling his conduct but chose not to do so. (May 2009 Progress Review)

The only evidence favorable to the defendant was testimony at the Reconsideration hearing from developmental and clinical psychologist Gillian Blair, Ph.D., on

human brain development from adolescence to adulthood. While Dr. Blair admitted having no neurological background, she testified that the adolescent brain was less developed than the adult brain and as a result, that teens were more impulsive, subject to mood swings, and less likely to consider the consequences of their actions than adults were. N.T. 12/16/09 at 40. She also testified that the defendant had suffered a setback in his treatment early in 2009 when he learned from a peer (as opposed to his mother or a staff member) that his father had been killed. *Id.* at 24.[7] The defendant's progress reports from Benchmark, however, show that the defendant had severe behavioral problems well before he learned of his father's death.

*Appellate Issues*

An appellate court reviews a lower court's sentence to determine whether the sentencing court abused its discretion by imposing a manifestly unreasonable penalty. An abuse of discretion requires the appellate court to find that that the sentence was the product of obvious unreasonableness, partiality, prejudices, bias, ill will, or such a lack of support that it is clearly erroneous. *Commonwealth v. Brougher*, 978 A.2d 373 (Pa.Super.2009). An appellate court will also not accept a sentence where the lower court did not consider the factors required by the Sentencing Code. *Commonwealth v. Parlante*, 823 A.2d 927, 930 (Pa.Super.2003).

7. The lower court was well aware that the defendant had no family support or guidance, that his parents were drug addicts who were incapable of functioning as parents. and that his childhood was abysmal.