J-S32039-16

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | |
|---|---|
| COMMONWEALTH OF PENNSYLVANIA, | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| Appellee | |
| v. | |
| NAFEAST FLAMER, | |
| Appellant | No. 2299 EDA 2014 |

Appeal from the Judgment of Sentence March 14, 2014
in the Court of Common Pleas of Philadelphia County
Criminal Division at No.: CP-51-CR-0007713-2009

BEFORE:  BOWES, J., MUNDY, J., and PLATT, J.[*]

MEMORANDUM BY PLATT, J.:                    **FILED May 11, 2016**

Appellant, Nafeast Flamer, appeals from the judgment of sentence imposed following his jury conviction of one count each of first-degree murder, criminal conspiracy to commit murder, carrying a firearm on the streets of Philadelphia, and possessing an instrument of a crime.[1]  We affirm.

This case arises from the fourteen-bullet shooting of Allen Moment, Jr. on a Philadelphia street in an ambush carried out by his extended family members; Moment died from his injuries approximately two-and-a-half years later.  The trial court summarized the factual background as follows:

_____

[*] Retired Senior Judge assigned to the Superior Court.

[1] 18 Pa.C.S.A. §§ 2502(a), 903(a)(1), 6108, and 907(a), respectively.

In early January, 2006, Allen Moment, Jr. was acting as peacemaker between two feuding groups of people in the area of 22nd Street and Pierce Street in Philadelphia, Pennsylvania. Moment was the cousin of [Appellant] and co-defendant Marvin Flamer. During the ongoing feud, Moment arranged to meet with [Appellant] and Hakim Bond in order to return a firearm that Moment had taken from [Appellant]. Abdul Taylor encountered [Appellant] and Bond as they waited for Moment. Shortly after Moment failed to arrive at the meeting, [Appellant], Bond, and Taylor were fired upon by some unknown assailant. [Appellant] believed that Moment had set them up, and told Taylor that [he] had been talking about "getting" Moment. On January 18, 2006, Taylor encountered a group of people in a lot on Ellsworth Street planning to go harm Moment. [Appellant] and Bond were among this group. Taylor saw approximately seven guns among this group of individuals.

On January 20, 2006, at approximately 8:50 p.m., Moment was walking on Pierce Street, near the intersection with 22nd Street, when he was approached by [Appellant], Bond, and two other individuals wearing dark hoodies. As this group approached Moment, a friend of Moment's, Shareem Nelson, called Moment and informed him of the group's approach. Moment responded "I'm cool, they are my peoples." Once [Appellant] and his companions reached Moment, the group opened fire on Moment, striking him approximately thirteen to fourteen times in the stomach, groin, and thigh areas. Co-defendant Marvin Flamer blocked Moment's possible escape with his vehicle.

Tony Waters, an off duty police officer who lived in the area, heard the gunshots and called 911. Police officers and paramedics arrived on the scene shortly thereafter and transported Moment to the Hospital at the University of Pennsylvania. Doctors determined that Moment's bowel was eviscerating out of his abdomen and he was taken to surgery immediately. Over the course of the next two and a half years in the hospital, Moment was treated by Dr. Carrie Sims and suffered kidney failure, an open wound in his abdomen, a perforated digestive system, repeated infections, tracheostomy, fluid collection around his heart, depression, and a hemorrhagic stroke.

In late January, 2008, Dr. Sims called a family meeting in Moment's hospital room and informed Moment that, while he had put up a good fight, he was dying and that he would not be leaving the hospital. While Moment could not move his body, Moment could communicate through head gestures and labored talking. After this meeting, Moment asked, after some insistence from his mother, to talk to a detective. On February 4, 2008, Moment was interviewed by Philadelphia Police detectives in the presence of his mother, Patricia Gooding, and uncle, Marquet Parsons. In this interview, Moment identified [Appellant] and Bond as the individuals who shot him. Moment further identified co-defendant Marvin Flamer as driving the get-away car that had blocked him in. Moment identified all three individuals in photo arrays. Moment informed Parsons that he did not talk to police prior to this interview because he did not want to be "called a snitch." On February 14, 2008, Moment provided a videotaped interview in his hospital room. Moment eventually succumbed to his injuries and died on August 6, 2008.

Following Moment's death, Abdul Taylor began cooperating with police and gave a statement on August 13, 2008. While this matter was pending for trial, Taylor's statement was distributed as part of discovery and was eventually seen by Derrick "Heavy" White. Taylor informed his mother that he feared being called a snitch and told her that "they goin' kill me, they got a hit out on me." While [Appellant] was incarcerated, he received several visits from White. White agreed to kill Taylor, as Taylor's testimony would prevent [Appellant] from coming home. On May 7, 2010, White shot Taylor in the head, killing him.[2]

(Trial Court Opinion, 11/07/14, at 2-5) (record citations and footnote omitted).

_____

[2] White was convicted in a separate trial of conspiring with the Flamers to murder Taylor. (*See* Trial Ct. Op., *infra* at 6 n.3).

- 3 -

Appellant proceeded to trial with co-defendant Marvin Flamer,[3] and the jury found him guilty of the above-mentioned offenses on January 23, 2014. The court deferred sentencing pending preparation of a pre-sentence investigation report (PSI) and a mental health evaluation. On March 14, 2014, the court imposed an aggregate sentence of incarceration of life without parole plus not less than twenty-one nor more than forty-five years.[4] The court denied Appellant's timely post-sentence motions on July 14, 2014. This timely appeal followed.[5]

Appellant raises eight issues for this Court's review:

> 1. Was the verdict against the weight of the evidence because the testimony of the Commonwealth's witnesses were in conflict with each other and inconsistent?
>
> 2. Should Appellant's **Batson**[[6]] Motion have been granted because the Commonwealth's first five peremptory challenges were used on African Americans?

_____

[3] Co-defendant Hakim Bond was tried separately. (**See** Trial Ct. Op., at 1).

[4] Appellant was seventeen-years-old at the time of the offense; he was sentenced on the first-degree murder conviction pursuant to 18 Pa.C.S.A. § 1102.1(a)(1). (**See** N.T. Sentencing, 3/14/14, at 7). The statute provides that juveniles convicted of first-degree murder after June 24, 2012, and who are older than fifteen years of age at the time of the commission of the offense, shall be sentenced to at least thirty-five years to life, or to a term of life imprisonment without parole. **See** 18 Pa.C.S.A. § 1102.1(a)(1).

[5] Pursuant to the trial court's order, Appellant filed a timely concise statement of errors complained of on appeal on August 22, 2014. The trial court entered an opinion on November 7, 2014. **See** Pa.R.A.P. 1925.

[6] **Batson v. Kentucky**, 476 U.S. 79 (1986).

3. Should Appellant's motion for mistrial have been granted because the deceased's mother made an inadmissible and highly prejudicial statement to the jury?

4. Should Appellant's motion for mistrial have been granted because the Commonwealth witness, Police Officer Hogue, made an inadmissible and highly prejudicial statement to the jury?

5. Did the trial court err by denying Appellant's request to direct the jury to disregard a question from the Commonwealth?

6. Did the Assistant District Attorney commit prosecutorial misconduct by making prejudicial and inflammatory statements to the jury?

7. Should the complaining witness' video have been excluded from evidence due to coercion?

8. Was the sentence imposed by the trial court excessive because the case was not rare and unusual?

(Appellant's Brief, at 1-2).

In his first issue, Appellant challenges the weight of the evidence supporting the jury's verdict, claiming that the testimony of the Commonwealth's witnesses was conflicting and inconsistent. (*See id.* at 5).[7] This issue is waived and would not merit relief.

Preliminarily, we observe that Appellant's single-page argument on this issue is undeveloped and that he cites only boilerplate law regarding

---

[7] Appellant preserved his weight claim by raising it in his post-sentence motion. *See* Pa.R.Crim.P. 607(A)(3); (*see also* Post-Sentence Motion, 3/21/14, at unnumbered page 1 ¶ B.3.).

weight of the evidence claims. Although Appellant baldly alleges that the Commonwealth's witnesses provided conflicting testimony regarding material issues in the case, he fails to identify specifically this allegedly conflicting testimony or provide this Court with any citations at all to the record. (*See id.* at 5-6). Thus, Appellant has waived this argument. *See* Pa.R.A.P. 2101, 2119(a)-(c).

Moreover, the record fully supports the trial court's ruling on this issue. The applicable standard of review is as follows:

> The finder of fact is the exclusive judge of the weight of the evidence as the fact finder is free to believe all, part, or none of the evidence presented and determines the credibility of the witnesses.
>
> As an appellate court, we cannot substitute our judgment for that of the finder of fact. Therefore, we will reverse a jury's verdict and grant a new trial only where the verdict is so contrary to the evidence as to shock one's sense of justice. A verdict is said to be contrary to the evidence such that it shocks one's sense of justice when the figure of Justice totters on her pedestal, or when the jury's verdict, at the time of its rendition, causes the trial judge to lose his breath, temporarily, and causes him to almost fall from the bench, then it is truly shocking to the judicial conscience.
>
> Furthermore, where the trial court has ruled on the weight claim below, an appellate court's role is not to consider the underlying question of whether the verdict is against the weight of the evidence. Rather, appellate review is limited to whether the trial court palpably abused its discretion in ruling on the weight claim.

*Commonwealth v. Boyd*, 73 A.3d 1269, 1274-75 (Pa. Super. 2013) (*en banc*) (citation and quotation marks omitted). "[T]he trial court's denial of a motion for a new trial based on a weight of the evidence claim is the least

assailable of its rulings." ***Commonwealth v. Weathers***, 95 A.3d 908, 911 (Pa. Super. 2014), *appeal denied*, 106 A.3d 726 (Pa. 2015) (citation omitted). When reviewing a weight claim, this Court carefully considers the findings and reasons advanced by the trial court, because the trial judge had the opportunity to hear and see the evidence presented. ***See Commonwealth v. Brown***, 48 A.3d 426, 432 (Pa. Super. 2012), *appeal denied*, 63 A.3d 1243 (Pa. 2013).

Here, the trial court determined:

> . . . [O]nly days before Moment's shooting, Abdul Taylor witnessed [Appellant], along with Bond, "plotting to go down . . . to harm [Moment]" while possessing several firearms. (N.T. Trial, 1/14/14, at 83; ***see id.*** at 84; ***see also*** N.T. Trial, 1/15/14, at 221-22). Shareem Nelson, Jeffrey Chandler, Jr., and Aisha Williams each testified that they witnessed multiple individuals in dark hoodies approach Moment at the corner of 22nd Street, where they shot Moment multiple times in the abdomen, pelvis, and upper thighs. (***See*** N.T. Trial, 1/14/14, at 113-15; 134-36, 156-57; ***see also*** N.T. Trial, 1/15/14, at 178-80). Aisha Williams, who knew [Appellant] all her life, identified [Appellant] as one of those individuals. (***See*** N.T. Trial, 1/15/14, at 180-81). Just prior to the shooting, after Nelson telephoned Moment to warn him that four men in hoodies were "running toward [him]," Moment told Nelson, "I'm cool, they are my peoples." (N.T. Trial, 1/16/14, at 19). While hospitalized, Moment stated repeatedly that he had been shot by his cousins, without identifying them by name. (***See*** N.T. Trial, 1/14/14, at 51; ***see also*** N.T. Trial, 1/15/14, at 139). Later on, when he believed he was about to die as a result of the extensive and lingering wounds which he sustained, Moment identified [Appellant] and Bond as the shooters and Marvin Flamer as the driver of the get-away car. (***See*** N.T. Trial, 1/14/14, at 51, 55-58; ***see also*** N.T. Trial, 1/15/14, at 86-88; N.T. Trial, 1/16/14, at 59, 67). When Taylor's statement to the police implicating [Appellant] was distributed as discovery, after repeated phone calls with [Appellant], Derrick "Heavy" White killed Taylor "in

order to get [Appellant] . . . home." (N.T. Trial, 1/17/14, at 31; *see id.* at 57-59).

All of this was compelling evidence that [Appellant] conspired to, and eventually did, shoot and kill Moment. Because the weight of the evidence fully supported the verdicts, the [c]ourt properly denied [Appellant's] post-sentence motion.

(Trial Ct. Op., at 6) (footnote and case citation omitted; record citation formatting provided).

After review of the record, we cannot conclude that the court's decision constituted a palpable abuse of discretion. *See Boyd*, *supra* at 1275. The jury, as finder of fact, while passing upon the credibility of witnesses and the weight of the evidence produced, was free to believe all, part, or none of the evidence presented at Appellant's trial, and its verdict of guilt does not shock one's sense of justice. *See id.* at 1274. Accordingly, Appellant's first issue is waived and would not merit relief.

In his second issue, Appellant argues that the trial court erred in failing to grant his *Batson* motion where the Commonwealth used its first five peremptory challenges to exclude African Americans from the jury. (*See* Appellant's Brief, at 6). Appellant contends that the Commonwealth's explanations for each challenge were "merely pretext to justify the fact that [it] was striking the jurors based on race[.]" (*Id.* at 7-8). We disagree.

"In *Batson*, the United States Supreme Court held the Fourteenth Amendment's Equal Protection Clause forbids the prosecution from using its peremptory challenges to exclude potential jurors based solely on their

race." ***Commonwealth v. Towles***, 106 A.3d 591, 601 (Pa. 2014), *cert. denied sub nom.* ***Towles v. Pennsylvania***, 135 S.Ct. 1494 (2015) (citation omitted).

> ***Batson*** set forth a three-part test for examining a criminal defendant's claim that a prosecutor exercised peremptory challenges in a racially discriminatory manner: first, the defendant must make a *prima facie* showing that the circumstances give rise to an inference that the prosecutor struck one or more prospective jurors on account of race; second, if the *prima facie* showing is made, the burden shifts to the prosecutor to articulate a race-neutral explanation for striking the juror(s) at issue; and third, the trial court must then make the ultimate determination of whether the defense has carried its burden of proving purposeful discrimination.

***Commonwealth v. Harris***, 817 A.2d 1033, 1042 (Pa. 2002), *cert. denied sub nom.* ***Harris v. Pennsylvania***, 540 U.S. 1081 (2003) (citations omitted).

> The second prong of the ***Batson*** test, involving the prosecution's obligation to come forward with a race-neutral explanation of the challenges once a *prima facie* case is proven, does not demand an explanation that is persuasive, or even plausible. Rather, the issue at that stage is the facial validity of the prosecutor's explanation. Unless a discriminatory intent is inherent in the prosecutor's explanation, the reason offered will be deemed race neutral.
>
> If a race-neutral explanation is tendered, the trial court must then proceed to the third prong of the test[.] . . . It is at this stage that the persuasiveness of the facially-neutral explanation proffered by the Commonwealth is relevant.

*   *   *

The trial court should consider the totality of circumstances when determining whether the prosecutor acted with discriminatory intent or engaged in purposeful discrimination. Great deference must be given to the trial court's finding as to an absence of discriminatory intent in peremptory challenges, and this finding will not be overturned unless clearly erroneous. Such deference is warranted because the trial court is in the position to make credibility determinations when viewing the demeanor of the prosecutor exercising the peremptory challenges.

*Towles*, *supra* at 601-02 (emphasis and citations omitted).

Here, after defense counsel raised a *Batson* challenge during *voir dire*, the Commonwealth outlined its reasons for striking the five potential jurors. (*See Voir Dire* Volume 1, 1/13/14, at 112-17). The trial court found each of the Commonwealth's explanations credible and race-neutral, and determined that it demonstrated no purposeful discrimination. (*See id.* at 114-17; *see also* Trial Ct. Op., at 8-9). After reviewing the record in light of relevant legal principles, we conclude the court's findings are supported by the record and free of legal error. *See Towles*, *supra* at 601-02. Therefore, Appellant's second issue does not merit relief.

In his third and fourth issues, Appellant maintains that the trial court erred in failing to grant his motions for a mistrial where the victim's mother and Police Officer Paul Hogue made inadmissible and highly prejudicial statements to the jury. (*See* Appellant's Brief, at 8). These issues are waived.

In an appellate brief, parties must provide an argument as to each question, which should include a discussion and citation of pertinent authorities. Pa.R.A.P. 2119(a). This Court is neither

- 10 -

obliged, nor even particularly equipped, to develop an argument for a party.  To do so places the Court in the conflicting roles of advocate and neutral arbiter.  When an appellant fails to develop his issue in an argument and fails to cite any legal authority, the issue is waived.

*Commonwealth v. Knox*, 50 A.3d 732, 748 (Pa. Super. 2012), *appeal denied*, 69 A.3d 601 (Pa. 2013) (case citations omitted).

Here, Appellant's arguments pertaining to his requests for a mistrial, comprising a combined single page, are woefully undeveloped.  Appellant neither cites nor discusses **any** legal authority to support his claims, nor does he provide this Court with citations to the record.  Accordingly, Appellant has waived his third and fourth issues.  *See* Pa.R.A.P. 2101, 2119(a)-(c); *Knox*, *supra* at 748.

In his fifth issue, Appellant argues "[t]he trial court erred in denying [his] request that the jury be directed to disregard a question from the Commonwealth."  (Appellant's Brief, at 9).  He points to a question the Commonwealth asked witness Sabrina Taylor implicating him in the murder of Abdul Taylor.  (*See id.*).  This claim is waived and lacks record support.

First, we observe that Appellant again cites no legal authority in support of his issue.  Thus, it is waived.  *See* Pa.R.A.P. 2101, 2119(a)-(b); *Knox*, *supra* at 748.

Moreover, the claim is plainly belied by the record, which reflects the following exchange:

[Assistant District Attorney]. You were with me and with us and here in the [criminal justice center] when Derrick "Heavy" White was convicted of first-degree murder; right?

[Sabrina Taylor]. Yes.

[Assistant District Attorney]. He was also convicted of conspiring with Marvin Flamer and [Appellant]?

[Attorney for Appellant]: Objection, Your Honor.

[Attorney for co-defendant]: Objection.

THE COURT: Sustained.

[Assistant District Attorney]: Based on his question, Judge.

THE COURT: I'll sustain the objection and direct the jury to disregard the question.

[Assistant District Attorney]: Yes, sir.

(N.T. Trial, 1/15/14, at 50-51).

Thus, a review of the relevant exchange confirms the trial court's assessment that "the record clearly reflects that not only did the [c]ourt sustain [Appellant's] objection to the Commonwealth's question, it further directed the jury to disregard the question without a request by [Appellant]." (Trial Ct. Op., at 14). Therefore, Appellant's fifth issue is waived and is belied by the record.

In his sixth issue, Appellant argues that the assistant district attorney committed prosecutorial misconduct warranting a new trial by making certain prejudicial and inflammatory statements in front of the jury. (*See* Appellant's Brief, at 9-11). Appellant challenges the following acts of the

prosecutor: his reference to Appellant as "Feast the Beast," a phrase drawn from poems Appellant had written; his reading of Appellant's poems during closing argument; and his questioning of witness Shareem Nelson. (*See id.* at 10-11). This issue is waived.

Specifically, the crux of Appellant's claim is that the prosecutor inappropriately referenced portions of certain poems that he wrote. (*See id.*). However, Appellant's four-sentence argument addressing the poems makes no attempt to describe them or their significance, explain why they were prejudicial or inflammatory, or cite to the record. Likewise, his conclusory sub-argument regarding an allegedly argumentative question the prosecutor posed to Shareem Nelson lacks citation to the record. Thus, Appellant's undeveloped sixth issue is waived. *See* Pa.R.A.P. 2101, 2119(a)-(c); *Knox*, *supra* at 748.

In his seventh issue, Appellant argues that the trial court should have excluded the victim's videotaped interview with police from evidence because it shows the police coaching him and instructing him when to nod his head. (*See* Appellant's Brief, at 11). He asserts that "[t]his is clearly coercion[.]" (*Id.*). This issue is also waived.

Specifically, Appellant's argument on this issue consists of only four conclusory sentences. (*See id.*). He again neither cites nor discusses any legal authority to support his claims, nor does he provide this Court with

- 13 -

citations to the record. Accordingly, Appellant's seventh issue is waived. *See* Pa.R.A.P. 2101, 2119(a)-(c); *Knox*, *supra* at 748.

In his eighth and final issue, Appellant challenges the discretionary aspects of his sentence, arguing that the sentence "was excessive because the case was not rare and unusual." (Appellant's Brief, at 12). He maintains there was no evidence to support the trial court's finding that the victim experienced unusual suffering. (*See id.*). This issue does not merit relief.

"A challenge to the discretionary aspects of a sentence must be considered a petition for permission to appeal, as the right to pursue such a claim is not absolute." *Commonwealth v. Hoch*, 936 A.2d 515, 518 (Pa. Super. 2007) (citation omitted). In order to reach the merits of such claim, we must determine:

> (1) whether the appeal is timely; (2) whether Appellant preserved his issue; (3) whether Appellant's brief includes a concise statement of the reasons relied upon for allowance of appeal with respect to the discretionary aspects of sentence; and (4) whether the concise statement raises a substantial question that the sentence is appropriate under the sentencing code.

*Commonwealth v. Edwards*, 71 A.3d 323, 329-30 (Pa. Super. 2013), *appeal denied*, 81 A.3d 75 (Pa. 2013) (citation omitted).

Here, although Appellant filed a timely appeal and preserved his challenge to his sentence in a post-sentence motion, he failed to include in his brief a concise statement of the reasons relied upon for allowance of appeal pursuant to Pa.R.A.P. 2119(f). Furthermore, the Commonwealth has objected to this omission. (*See* Commonwealth's Brief, at 25). "In such

circumstances, this Court is precluded from reviewing the merits of the claim and the appeal must be denied." ***Commonwealth v. Kiesel***, 854 A.2d 530, 533 (Pa. Super. 2004) (citations omitted). Therefore, we may not review the merits of Appellant's sentencing claim, and we deny allowance of appeal. ***See id.***[8] Accordingly, Appellant's final issue on appeal does not merit relief, and we affirm the judgment of sentence.

Judgment of sentence affirmed.

Judgment Entered.

_____
Joseph D. Seletyn, Esq.
Prothonotary

Date: 5/11/2016

_____

[8] Moreover, Appellant's assertion that there is no evidence indicating that the victim experienced unusual suffering is specious. At trial, Dr. Carrie Sims, the experienced trauma surgeon who treated Moment during the two and a half years following the shooting, testified "this was truly the most horrific suffering I have seen in my entire career. It was awful." (N.T. Trial, 1/14/14, at 163; ***see id.*** at 158-163).

- 15 -