J-S57019-15

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | |
|---|---|
| COMMONWEALTH OF PENNSYLVANIA | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| Appellee | |
| v. | |
| CHARLES RICE | |
| Appellant | No. 1287 EDA 2014 |

Appeal from the Judgment of Sentence May 24, 2013
In the Court of Common Pleas of Philadelphia County
Criminal Division at No(s): CP-51-CR-0013974-2011
CP-51-CR-0013976-2011
CP-51-CR-0013978-2011
CP-51-CR-0013980-2011

BEFORE: MUNDY, J., OTT, J., and STABILE, J.

MEMORANDUM BY OTT, J.:                **FILED JANUARY 20, 2016**

Charles Rice appeals from the judgment of sentence imposed on May 24, 2013, in the Court of Common Pleas of Philadelphia County, which was made final by the denial of post-sentence motions on October 2, 2013. On February 8, 2013, a jury convicted Rice of four counts of attempted homicide, three counts of aggravated assault, three counts of conspiracy to commit homicide, four counts of conspiracy to commit aggravated assault, one count of firearms not to be carried without a license, one count of carrying firearms in public in Philadelphia, and one count of possession of a

firearm by a minor.[1]  The court sentenced Rice to an aggregate term of 30 to 60 years' incarceration.  On appeal, Rice raises numerous issues, challenging the sufficiency of the evidence, the weight of the evidence, the trial court's jury instructions, and the discretionary aspects of the sentencing.[2]  After a thorough review of the submissions by the parties, the certified record, and relevant law, we affirm.

The trial court set forth the factual history as follows:

> On September 25, 2011, at approximately 9:30 p.m. on the 1600 block of 18th Street in South Philadelphia, Ms. Latice Johnson was attempting to gather her seven children to go home for the evening while she waited for her food delivery to arrive. At that time, Ms. Johnson was outside with:  her sons Khalief Ladson, age seventeen (17), and Kyier Ladson, age seven (7); her daughters Latoya Lane, age twenty-three (23); Kira Ladson, age nine (9), and Kaya Ladson, age five (5); her niece, Denean Thomas, age six (6); and her nephews, Kyree Ladson, Lasar Johnson, and Tyrie Johnson, each of whom are about age thirteen (13).  Ms. Lane and her youngest sister, Kaya, were standing across the street from the house, near Ms. Johnson's nephews, who were playing basketball.  Aside from Khalief, who on that day went fishing with his grandfather, Ms. Johnson's family had spent the day visiting her children's father at the hospital because he was battling brain cancer.
>
> That evening was a warm and clear night and, while she was waiting for her delivery to arrive, Ms. Johnson was sitting on the front steps of her mother's house, facing Fernon Street.  Ms. Johnson watched as the defendant, Charles Rice, and his accomplice, walked side-by-side to the curb about twenty feet

---

[1]  18 Pa.C.S. §§ 901(a), 2702(a), 903 (c), 903(c), 6106, 6108, and 6110.1, respectively.

[2]  We have reorganized Rice's issues in our analysis based on the nature of the claims.

away from her and started shooting at her and her family. [Rice] was wearing black *Nike* sweatpants and the hood on his sweater was up and tied. When he started shooting, Ms. Johnson stared at [Rice]'s face, in shock, and noticed the defendant's braided hair sticking out of the right side of the hood. Ms. Johnson testified that [Rice]'s whole face was visible and recognizable since [Rice] was standing near streetlights when he was shooting at her and her family. Though she did not see [Rice]'s gun, Ms. Johnson observed sparks coming from the defendant's hands.

Ms. Johnson testified that she recognized [Rice] because, a few years before the shooting, she had seen [Rice] numerous times since he was friends with her son Khalief. On one occasion, Ms. Johnson picked up her son from [Rice]'s house as the two were doing a school project together. Ms. Johnson was also [Rice]'s "friend" on *Facebook*, meaning that she would see when [Rice] updated his status or post to his account. On the day of the shooting, however, [Rice] and Khalief were no longer friends. Rather, Khalief was a "person of interest" in a prior shooting of [Rice] on September 3, 2011, three weeks prior to the shooting by the defendant in the instant case.

At some point while [Rice] and his accomplice continued to shoot at her and her family, Ms. Johnson flipped over, fell on the ground, and covered two of her children, Kira and Kyier. Seven year old Kyier tried to open the door to his grandmother's house, but was prevented from doing so because bullets were, according to Ms. Johnson, "flying off the walls." Meanwhile, Ms. Lane, who was standing across the street, looked up from her phone when she heard the shots and saw that [Rice]'s accomplice was standing at the corner of Fernon Street. Upon hearing approximately five shots, Ms. Lane began to run across the street toward her grandmother's house and saw [Rice]'s accomplice point a gun towards her and her family.[12]

[12] Ms. Lane identified the co-defendant in this case, Tyler Linder, as the other shooter on Fernon Street. The jury found that Mr. Linder was not guilty of all the charges levied against him pertaining to this shooting.

Eventually, once the shooting stopped, Ms. Johnson looked up and saw [Rice] flee up Fernon Street. After the shooting, Ms. Johnson and her family ran into Ms. Johnson's mother's house.

As Ms. Johnson entered the house, the children were screaming "Denean is gonna die," and Ms. Johnson saw a pile of blood right by Denean. Ms. Johnson then held Denean in her arms until Officer Charles Forrest of the Philadelphia Police Department arrived. Though an ambulance had been called, Officer Forrest believed the ambulance was taking too long to arrive. As a result, Officer Forrest drove Denean, Ms. Johnson, Ms. Thompson (Denean's mother), and Denean's aunt to the emergency room at the Children's Hospital of Pennsylvania [("CHOP")].[13] Ms. Johnson was later treated that evening at the Hospital of the University of Pennsylvania ("HUP").

Ms. Lane and her brother Khalief were driven to Methodist [H]ospital by their grandfather. Ms. Lane was later transferred to HUP. As a result of this shooting, four separate victims incurred numerous gunshot wounds: (1) six year old Denean Thomas;[14] (2) Ms. Latrice Johnson;[15] (3) Ms. Latoya Lane;[16] and Mr. Khalief Ladson.[17]

Denean Thomas suffered two gunshot wounds to her leg. One gunshot was a grazed wound to Denean's left leg and the bullet from the second gunshot entered Denean's leg. The bullet which entered Denean's leg also had to be surgically removed.[18] Ms. Johnson suffered wounds to both of her legs, including superficial gunshot wounds to her right knee, right thigh, left knee, left upper calf, and left lower calf.

[13] Denean's mother and aunt were not at the scene during the shooting.

[14] Denean is the victim pertaining to all charges in CP-51-CR-0013974-2011.

[15] Ms. Johnson is the victim pertaining to all charges in CP-51-CR-0013976-2011.

[16] Ms. Lane is the victim pertaining to all charges in CP-51-CR-0013978-2011.

[17] Mr. Ladson is the victim pertaining to all charges in CP-51-CR-0013980-2011.

[18] Denean was unavailable to testify at trial because, [o]n February 3, 2012, nearly a year before the trial, Denean

passed away as a result of her pre-existing brain cancer: intrinsic pontine glioma.

Ms. Lane suffered a single gunshot to her left leg. As a result of that gunshot, Ms. Lane was hospitalized for a week, suffered two broken bones in her left leg, a fracture to her third and fourth metatarsals in her foot, and underwent surgery to her leg. To recover from the shooting, Ms. Lane's leg was placed in a cast, and she was required to use crutches and a walker. Ms. Lane testified that, as of the date of the trial, whenever she showers, she feels pain in her foot from the exit wound and feels as if the wound will reopen in the shower. Her foot also hurts whenever it rains. Finally, Khalief Ladson suffered a single gunshot wound to the large toe on his left foot, which fractured that toe.

…

At about 9:37 p.m. on the night of the shooting, Officer For[r]est, a uniformed officer driving a marked police vehicle, responded to the scene. Other officers were already present at the scene when Officer For[r]est arrived. A few minutes after he arrived, Officer Forrest drove Denean, Ms. Johnson, Ms. Thompson (Denean's mother), and Denean's aunt to the emergency room [at CHOP]. Once he arrived at the hospital, Officer Charles gathered family information for Denean and then interviewed Ms. Johnson at HUP. Ms. Johnson indicated that the shooters were "[o]ne black male wearing a gray hoodie and … [one] with a black hoodie and they both had black sweatpants." Ms. Johnson then gave Officer Charles a physical description of the two (2) shooters, but did not identify by name either of the shooters involved.

Meanwhile, at about 9:35 p.m., Officer Lynne Zirilli of the Philadelphia Police Department traveled to Methodist Hospital in response to a radio call concerning the shooting. Officer Zirilli interviewed Khalief Ladson for about three minutes and Latoya Lane for approximately five to six minutes, each in separate rooms at the hospital. Mr. Ladson told Officer Zirilli that he was sitting on the steps with other family members when unknown males started shooting at his family from the other side of the street. Mr. Ladson further described the perpetrators as two (2) to three (3) black males, in dark hoodies.

Ms. Lane told Officer Zirilli that she was standing outside her grandmother's house when she heard gunshots and that she believed the shooting was by two (2) to three (3) black males. Officer Zirilli further noted that it was difficult to get information from Ms. Lane because she was in a lot of pain. According to Officer Zirilli, Ms. Lane seemed more worried about her foot and her pain than talking to the officer.

Just before midnight that evening, Detective Robert Spadaccini of the Philadelphia Police Department responded to the crime scene. Detective Spadaccini recovered twelve (12) .380 caliber fired cartridge casings ("FCCs"), most of which were recovered from near the corner of 18th and Fernon Street. The detective also noticed blood and a shoe on the front porch of Ms. Johnson's mother's house. At a later date, Officer Jesus Cruz of the Firearms Identification Unit of the Philadelphia Police Department concluded, to a reasonable degree of scientific certainty, that five of the recovered FCC's were fired from the same firearm, most likely from a semi-automatic pistol. Officer Cruz also concluded that all of the recovered FCC's were from previously fired bullets.

The day after the shooting, September 26, 2011, Sergeant Detective John Craig of the Philadelphia Police Department interviewed Ms. Lane and Ms. Johnson at HUP. During his interview of Ms. Johnson, Sergeant Craig presented a photo array of eight individuals, one of which included the defendant's picture. Without hesitation, Ms. Johnson identified [Rice] as one of the shooters. Ms. Johnson also signed her name next to the picture of [Rice].

Sergeant Craig also obtained a bullet fragment from a security officer at the hospital. The bullet fragment was recovered from Denean's leg after it was surgically removed from that leg. Thereafter, Sergeant Craig applied for and received a warrant for [Rice]'s arrest.

On September 27, 2011, pursuant to the arrest warrant, [Rice] turned himself in at the First District police station at 2301 South 24th Street. [Rice] was accompanied by his mother, Ms. Crystal Cooper, and a third, unidentified woman.[19] [Rice] indicated to the arresting officer that he had staples in his abdomen and that he was taking Oxycodone for his pain. At the time of his arrest, [Rice] was not using crutches or a walker, and

his hair was braided in the style of cornrows. Ms. Duncan, [Rice]'s godmother, also testified that on the day of the shooting, [Rice]'s hair was braided.

[19] During the trial, the defense maintained that this third female was [Rice]'s godmother, Ms. Deania Duncan, who was allegedly with [Rice] to serve as his alibi. None of the testifying officers, however, remembered that Ms. Duncan was with [Rice] prior to his arrest. (See N.T. 02/01/13 at 25, 28 (testimony of Sergeant Francis Kelly, the arresting officer, who could not recall whether anyone accompanied [Rice] and his mother; N.T. 02/04/13 at 127, 132 (testimony of Detective Spadaccini, who indicated that when he met [Rice] and his mother outside of the police station prior to his arrest, that there was "another female – I don't know her name," but that he did not see Ms. Duncan that day).

At trial, the Commonwealth entered into evidence a "certificate of non-licensure for the defendant Charles Rice," which stated that, at the time of the shooting, [Rice] did not have a license to carry a firearm in the city and county of Philadelphia.

…

On September 3, 2013, a little over three weeks prior to this shooting in this case, [Rice] was shot twice, once in his thigh and once in his abdomen. [Rice] was treated at Jefferson Hospital from September 3, 2013 to September 11, 2013. As a result of that shooting, [Rice] underwent surgery of his abdomen, from which the hospital recovered a bullet. The bullet wound did not cause any damage to [Rice]'s small or large intestine. Thereafter, [Rice]'s abdomen was sewed and stapled together, and [Rice] was prescribed Percocet, which contains Oxycodone, for his pain.

According to his hospital discharge papers, one week after his surgery, [Rice] had "complete independence" in transfer mobility (getting up and down from the bed), and locomotion (walking). The discharge papers also indicated that [Rice] could return to school by September 25th (the day of the shooting), and did not order [Rice] to undergo bed rest. [Rice]'s pediatrician, Dr. Theodore Tapper, examined [Rice] on

September 20, 2011 and testified that, in his opinion[,] it was "extremely unlikely" that the defendant could run down the street on September 25th because of the amount of pain [Rice] was in at that doctor's appointment. Dr. Tapper readily admitted, however, that he did not know how much pain medication – or, more specifically, how many Percocets – that [Rice] had taken to alleviate his pain on September 25th.

On the day [Rice] was shot, [Rice]'s mother, Crystal Cooper, spoke with Detective Spadaccini over the phone and told the detective that the defendant was unavailable to talk. Ms. Cooper and Detective Spadaccini were colleagues at the Philadelphia District Attorney's Office when her son was shot. At the time of her son's shooting, Ms. Cooper had worked at the District Attorney's Office for sixteen (16) years and had sat in the cubicle across from Detective Spadaccini for two (2) years. Detective Spadaccini asked Ms. Cooper to contact him when she believed that [Rice] was able to talk about his own shooting. On September 16, 2011, Ms. Cooper called [D]etective Spadaccini and informed him that her son would come into the First District station to talk. When Detective Spadaccini interviewed [Rice] on that day, [Rice] was uncooperative, refused to fill out a statement or look at photos, and said to the detective that "[the defendant didn't know who shot him; and if he did, he wouldn't tell [Detective Spadacci] anyway."

During his trial, [Rice] presented two witnesses who purported to be [Rice]'s alibi for the shooting in this case: Ms. Duncan, the defendant's godmother, and Ms. Duncan's sixteen (16) year old son, Quadifi Malone. Ms. Duncan testified that [Rice] stayed at her house at 5438 Locust Street in [W]est Philadelphia from September 11, 2013 to the date of [Rice]'s arrest, September 27, 2013, and that, on the date of the shooting, that she was with [Rice] from 7:00 a.m. to 7:00 p.m. Ms. Duncan further testified that [Rice] had left the house on September 16th (for the police interview), and September 20th (for a doctor's appointment) but that he had not left her house during his stay except for those appointments.

Ms. Duncan also stated that, on the day of the shooting for this case, seven people were home with [Rice] and that she was personally in the room with [Rice] and her son, Mr. Quadifi Malone, throughout that day. Ms. Duncan admitted, however, that on February 11, 2011, she had been convicted of two retail

- 8 -

thefts and also that she could not be [Rice]'s alibi because she was not home at the time of the shooting. Nevertheless, Ms. Duncan maintained that, on the date [Rice] was arrested, she accompanied [Rice] to the police station and told a detective that she knew where [Rice] was on the night of the shooting. According to Ms. Duncan, the detective replied in response that the police "did not need" her and that she should "just leave."

Mr. Malone testified that, at the time of the shooting, he had known [Rice] for four (4) to five (5) years and that [Rice] was like a brother to him. Additionally, Mr. Malone testified that, aside from his thirty minute nap at 3:00 p.m., he was with [Rice] watching movies in the defendant's room on September 25, 2011. In contrast to his mother, Mr. Malone testified that the only people who were home and with [Rice] were [Rice], him, and his grandfather. Likewise, Mr. Malone testified that aside from his mother, [Rice]'s mother, and [Rice]'s defense attorney, he had never told anyone that he was with the defendant on the night of the shooting, and that he was never asked by the police or the district attorney's office to give a statement.

On rebuttal, Officer Donna Simmons of the Philadelphia Police Department testified that she came into contact with [Rice] on September 19, 2011 on the 2400 block of Sheridan Street in [S]outh Philadelphia. At the time, [Rice] was standing in front of a vacant property with one other male and one black female. [Rice] further told Officer Simmons that his home address was 1613 [S]outh Orkney Street in Philadelphia, rather than the [W]est Philadelphia address of his godmother. Detective Spadaccini then testified that neither Ms. Duncan nor his former colleague, Ms. Cooper ([Rice]'s mother) ever indicated to him that [Rice] had an alibi for the night of the shooting. Detective Spadaccini also testified that, though the case was not assigned to him, he had interviewed codefendant Linder's alibi in the case, and that he would have given any alibi information about [Rice] to the assigned detective.

Additionally, Angelique Linder, the mother of the codefendant in this case, testified that she drove by [Rice] at approximately 1:00 p.m. in south Philadelphia on September 24, 2011 (the day before the shooting). Ms. Linder stated that she saw [Rice] twice that day near Snyder Avenue around 6th Street in south Philadelphia. When Ms. Linder first saw [Rice], [Rice]

was walking with a number of other boys, as if they were going to the store. Later, Ms. Linder also saw [Rice] sitting on the steps across the street from the park.

Finally, Assistant District Attorney Richard Boyd, the initial assigned assistant district attorney to the case, testified that he had personally interviewed the alibi witnesses for the codefendant, but that neither he nor any of his detectives were able to interview Ms. Duncan or Mr. Malone before the trial. In addition, Mr. Boyd testified that he was first given the list of [Rice]'s alibi witnesses on April 26, 2012 (approximately seven months after [Rice] was arrested), and that he requested detectives to interview those witnesses on two separate occasions. According to Mr. Boyd, on both of those occasions the detectives were unsuccessful. Finally, Mr. Boyd testified that [Rice]'s mother, Ms. Cooper, worked with him in the Major Trials Unit of the District Attorney's Office and that Ms. Cooper never once reached out to him to give him any information about an alibi.

Trial Court Opinion, 12/23/2014, at 3-13 (record citations and some footnotes omitted).

The matter proceeded to a jury trial, which took place between January 30, 2013 and February 8, 2013. As indicated above, the jury convicted Rice of four counts of attempted homicide, three counts of aggravated assault, three counts of conspiracy to commit homicide, four counts of conspiracy to commit aggravated assault, one count of firearms not to be carried without a license, one count of carrying firearms in public in Philadelphia, and one count of possession of a firearm by a minor. On May 24, 2013, the court sentenced Rice to the following:

For CP-51-CR-0013974-2011, th[e] Court sentenced [Rice] to concurrent terms of seven (7) to fourteen (14) years for Attempted Homicide, and seven (7) to fourteen (14) years for Conspiracy to Commit Homicide. Th[e] Court also sentenced

[Rice] to a consecutive term of two (2) to four (4) years incarceration for Firearms Not to Be Carried Without a License. For CP-51-CR-0013976-2011, CP-51-CR-0013978-2011, and CP-51-CR-0013980-2011, th[e] Court sentenced [Rice] to seven (7) to fourteen (14) years for each count of Attempted Homicide. Th[e] Court ordered each of these sentences to run consecutively with the above sentencing. [Rice]'s Aggravated Assault convictions merged with the above sentencing for Attempted Murder. Th[e] Court imposed no further penalty on the remaining charges.

*Id.* at 2 n. 8.

Rice filed a post-sentence motion on June 3, 2013, which was denied by operation of law on October 2, 2013. This timely appeal followed.[3]

In Rice's first issue, he contends there was insufficient evidence to convict him of all counts

where the verdicts were based on an identification made by a witness who had a limited opportunity to observe the perpetrator; where the charges of Attempted Murder were based on injuries to the lower extremities; where police found no evidence of strike marks or damage to the front of property as described by Latrice Johnson; and where Khalief Ladson refused to appear in court[.]

Rice's Brief at 14. Rice mainly argues, "[T]he evidence presented at trial was insufficient to sustain a conviction for all charges because Latrice

---

[3]   On October 29, 2013, the trial court ordered Rice to file a concise statement of errors complained of on appeal pursuant to Pa.R.A.P. 1925(b). On November 18, 2013, Rice filed a concise statement, and a request for extension of time, as the relevant notes of testimony had not been made available. One year later, once the notes of testimony were completed, the court issues an amended Rule 1925(b) order, directing Rice to file a supplemental concise statement within 14 days. Rice complied with the court's request on December 2, 2014. The trial court issued an opinion pursuant to Pa.R.A.P. 1925(a) on December 23, 2014.

Johnson's identification was fabricated and not based on what she observed the night of the incident." Rice's Brief at 15. He states Johnson had not seen him in four to five years to properly identify him. *Id.* at 16-17. Moreover, Rice alleges:

> The incident occurred quickly, [Johnson] did not look at the shooter the entire incident, the corner of Fernon and Locust [Streets] was poorly lit on the night of the incident, and the shooter's head was covered by a hoodie tied under the chin, and the braids she demonstrated stuck out of the sides of the hoodie. Most importantly[,] she never mentioned that the shooter was "CJ" [Rice's nickname] during the radio call to police, she did not identify him as the shooter to police [e]n route to the CHOP hospital, and did not identify the shooter as "CJ" when she was interviewed at HUP while receiving treatment.

*Id.* at 15-16 (record citations omitted). Rice further emphasizes:

> [Johnson's] failure to provide this identification evidence when asked by police on multiple occasions strongly suggests that she did not identify "CJ" because she did not see the shooter and did not know the shooter. [Johnson] testified that the shooter had braids that hung out of the side of the hoodie and [Exhibit] C29 clearly shows that [Rice]'s hair was braided flat to his head and ran to the back of his head.

*Id.* (record citations omitted).

Rice also contends:

> While the act of firing multiple rounds at multiple people may be construed as attempted murder, such a conclusion was improper where the gunfire in this instance was aimed at the feet, legs and ground areas of the victims. [Johnson] testified that the shots hit the walls above the porch and below the window but the officers found no evidence of gunfire in those areas. Neither projectiles nor fragments were found in the walls, on the porch o[r] on the ground around the porch. The shooters did not strike either victim in a vital section of their bodies.

*Id.* at 19 (record citations omitted). Based on this evidence, Rice argues the Commonwealth did not demonstrate the shooters acted with malice or that they possessed the specific intent to kill. *Id.* at 19-20. Rice also points out that he presented alibi testimony to show that as a result of a recent gunshot injury, he could not have run from the scene of the incident as Johnson described the perpetrators doing. *Id.* at 20.

Our review of such claims is well-settled:

The standard we apply in reviewing the sufficiency of the evidence is whether viewing all the evidence admitted at trial in the light most favorable to the verdict winner, there is sufficient evidence to enable the fact-finder to find every element of the crime beyond a reasonable doubt. In applying the above test, we may not weigh the evidence and substitute our judgment for the fact-finder. In addition, we note that the facts and circumstances established by the Commonwealth need not preclude every possibility of innocence. Any doubts regarding a defendant's guilt may be resolved by the fact-finder unless the evidence is so weak and inconclusive that as a matter of law no probability of fact may be drawn from the combined circumstances. The Commonwealth may sustain its burden of proving every element of the crime beyond a reasonable doubt by means of wholly circumstantial evidence. Moreover, in applying the above test, the entire record must be evaluated and all evidence actually received must be considered. Finally, the finder of fact while passing upon the credibility of witnesses and the weight of the evidence produced, is free to believe all, part or none of the evidence.

*Commonwealth v. Melvin*, 103 A.3d 1, 39-40 (Pa. Super. 2014) (citation omitted).

Here, the trial court initially found this issue was waived due to lack of compliance with Pennsylvania Rule of Appellate Procedure 1925. *See* Trial Court Opinion, 12/23/2014, at 14-15. *See Commonwealth v. Garang*, 9

A.3d 237, 244 (Pa. Super. 2010) ("[T]his Court reiterated that when challenging the sufficiency of the evidence on appeal, the [a]ppellant's [Rule] 1925 statement must 'specify the element or elements upon which the evidence was insufficient' in order to preserve the issue for appeal. Such specificity is of particular importance in cases where, as here, the [a]ppellant was convicted of multiple crimes each of which contains numerous elements that the Commonwealth must prove beyond a reasonable doubt.") (internal citations omitted).

Specifically, the court opined Rice failed to specify the elements of his multiple convictions, which he considered were insufficiently established by the evidence. Indeed, Rice's concise statement with regard to this issue merely states: "Whether the evidence presented at trial was sufficient to convict [Rice] of [] all charges where the verdicts were based on an identification made by a witness who had a limited opportunity to observe the perpetrator?" Statement of Errors Complained of on Appeal Pursuant to Pa.R.A.P. 1925(b), 11/18/2013, at 1. We agree with the trial court's finding. Accordingly, with regard to Rice's argument that the Commonwealth did not establish the shooters acted with malice or a specific intent to kill because the victims were not shot in a vital part of the body, we conclude this contention is waived.

Likewise, we note, "[I]n evaluating the sufficiency of the evidence, we do not review a diminished record. Rather, the law is clear that we are

required to consider all evidence that was actually received, without consideration as to the admissibility of that evidence or whether the trial court's evidentiary rulings are correct." ***Commonwealth v. Gray***, 867 A.2d 560, 567 (Pa. Super. 2005), *appeal denied*, 879 A.2d 781 (Pa. 2005). The Commonwealth's evidence, if believed, was sufficient to demonstrate all of the crimes, particularly that Rice shot at the victims and the circumstances surrounding the incident demonstrated malice and specific intent.[4]

Moreover, even if the issue was not waived, to the extent that Rice attacks Johnson's identification as insufficient, we find that Rice's argument goes to the weight of the evidence, not sufficiency, as "any indefiniteness and uncertainty in the identification testimony goes to its weight." ***Commonwealth v. Valentine***, 101 A.3d 801, 806 (Pa. Super. 2014) (citation omitted). Furthermore, the jury, sitting as the fact finder, was free to believe all, part or none of Johnson's testimony. ***Melvin***, 103 A.3d at 40.

As the trial court properly noted:

> Ms. Johnson, one of [Rice]'s victims and an eyewitness to the shooting, unequivocally identified [Rice] at trial as one of the shooters in this case. Despite extensive cross-examination, Ms. Johnson never wavered. Ms. Johnson testified that she watched [Rice] walk up, close to her (twenty feet away), that [Rice]'s face was fully visible because he was standing near streetlights, that she stared at [Rice]'s fully visible face when he started shooting, and that she noticed that [Rice] had braided hair.

---

[4] One could infer that it was pure luck that Rice and his cohort did not hit a conventional vital part of the victims' bodies as they were standing only 20 feet away and firing multiple rounds directly at the victims.

Additionally, according to Ms. Johnson and Sergeant Craig, the day after the shooting, Ms. Johnson, without hesitation, unequivocally identified [Rice] as the shooter in a photo array of eight individuals.

Ms. Johnson's identification was further corroborated by the fact that numerous witnesses testified that [Rice] had braided hair at, or near, the time of the shooting, and that all of the other interviewed victims in the shooting indicated that the shooters were dark males.

While [Rice] did call two alibi witnesses and a doctor in his defense, and challenged the fact that Ms. Johnson did not identify [Rice] on the day of the shooting, any contention that the jury should have believed [Rice]'s alibi defense over that of the Commonwealth's witnesses is improper in a sufficiency of the evidence claim. **Commonwealth v. Gibbs**, 981 A.2d 274, 282 (Pa. Super. 2009) ("An argument that the finder of fact should have credited one witness' testimony over that of another witness goes to the weight of the evidence, not the sufficiency of the evidence."). Therefore, the Commonwealth presented more than sufficient evidence that [Rice] was one of the shooters in this case.

Trial Court Opinion, 12/23/2014, at 15-16 (record citations omitted).

Accordingly, we conclude that Rice's first argument fails.

In Rice's second argument, he contends the verdict was against the weight of the evidence.[5] Rice's Brief at 21-22. Specifically, he recites most of his sufficiency argument again, stating:

[Johnson] could not and did not see the shooter sufficiently to identify him. Her description of braids hanging out of the hoodies of the shooter makes it impossible for [Rice] to be the shooter. [Rice]'s hair style was depicted in his arrest photo. [Rice]'s hair was braided to the back of his head and would not

_____

[5] Rice properly preserved his challenge to the weight of the evidence by raising it in a post-sentence motion. **See** Pa.R.Crim.P. 607(A).

- 16 -

hang outside a hoodie covering his head and ears, whether tied or untied.

The facts presented by the Commonwealth were insufficient to demonstrate that [Rice] was guilty of the charges. Further, the evidence by the Detectives was that they found no evidence that shots were fired into [or onto] the porch, house, or ground surrounding the house. Absen[t] physical evidence when reviewed with the nature of injuries, the shooters were not attempting to kill the victims. Where the evidence failed to establish each and every element beyond a reasonable doubt that [Rice] committed the offenses, the jury verdicts must not stand.

*Id.* at 22.

Appellate review of a weight of the evidence claim is well-established:

A weight of the evidence claim concedes that the evidence is sufficient to sustain the verdict, but seeks a new trial on the ground that the evidence was so one-sided or so weighted in favor of acquittal that a guilty verdict shocks one's sense of justice. *Commonwealth v. Widmer*, 560 Pa. 308, 318–20, 744 A.2d 745, 751–52 (2000); *Commonwealth v. Champney*, 574 Pa. 435, 443–44, 832 A.2d 403, 408–09 (2003). On review, an appellate court does not substitute its judgment for the finder of fact and consider the underlying question of whether the verdict is against the weight of the evidence, but, rather, determines only whether the trial court abused its discretion in making its determination. *Widmer*, 560 Pa. at 321–22, 744 A.2d at 753; *Champney*, 574 Pa. at 444, 832 A.2d at 408.

*Commonwealth v. Lyons*, 79 A.3d 1053, 1067 (Pa. 2013), *cert. denied*, 134 S.Ct. 1792 (U.S. 2014).

Here, the trial court found the following:

[Rice]'s weight of the evidence claim is groundless.

…

In the instant case, the jury clearly found Ms. Johnson's testimony that [Rice] was the shooter was more credible than

- 17 -

[Rice]'s purported alibi witnesses. This is not surprising. As discussed above, Ms. Johnson never wavered in identifying [Rice], whom she recognized because her son was friends with [Rice]. She had a clear, lit view of [Rice] as he and his accomplice walked towards her, and she stared at his face in disbelief as [Rice] began shooting at her and her family. In doing so, she noticed that he had braided hair, a fact which was corroborated by the fact that [Rice] had braided hair on the date of his arrest (2 days after the shooting), and by [Rice]'s own godmother, who stated that [Rice]'s hair was braided on the day of the shooting.

Ms. Johnson's testimony was only controverted by [Rice]'s two alibi witnesses and a doctor: [Rice]'s godmother, Ms. Duncan, her son, Mr. Malone, and Dr. Theodore Tapper ([Rice]'s pediatrician[]). However, the testimony of all three of these witnesses was riddled with inconsistencies and faulty conclusions. Dr. Tapper, who met with [Rice] as a result of [Rice]'s prior gunshot wound, testified as an expert that it was "highly unlikely" that [Rice] would be able to run on the day of the shooting because [Rice] was in pain. In making this analysis, however, Dr. Tapper had no insight into whether [Rice] had taken his pain medication – Percocet – to alleviate any discomfort he may have had in fleeing from the scene. Likewise, Dr. Tapper's assessment was contrary to the hospital records for [Rice] (dated nine days earlier than [Rice]'s visit to the Doctor). Those records indicated that [Rice], just one week after he was shot, had "complete independence" in locomotion (walking) and transfer mobility (getting up and down), and that [Rice] could return to school with his classmates by the day of the shooting, September 25, 2011.

Similarly, Ms. Duncan readily testified that [Rice] stayed in her home in Philadelphia and that, aside from [Rice]'s police interview on September 16th and doctor's visit on September 20th, he had not and could not physically (due to his injuries) have left her home from September 11, 2011 to September 27, 2011. Likewise, Ms. Duncan testified that, on the date of the shooting, she was with [Rice] from 7:00 a.m. to 7:00 p.m. and that she, her four children, and her mother and father were all home throughout that day. In contrast, Mr. Malone testified that he and [Rice] spent … nearly the entire day leading up to the shooting watching a movie, and that the only people who were

home that day were Mr. Malone, [Rice], and Ms. Duncan's father.

Furthermore, Mr. Malone testified that, the day before the shooting, on September 24th, he and [Rice] had also spent the entire day together watching movies. Such testimony of both witnesses was easily rebutted by two Commonwealth witnesses, Ms. Linder (the codefendant's mother) and Officer Simmons, both of whom testified that they personally saw the defendant either standing or walking around South Philadelphia on September 19th and September 24th. Given these inconsistencies (among others), and the fact that there was no record that either Ms. Duncan, [Rice]'s godmother, or Mr. Malone, the defendant[']s "brother," had ever told anyone other than defense counsel or [Rice]'s mother that they were [Rice]'s alibi, the verdict could hardly be said to shock one's sense of justice and was fully consistent with the totality and weight of the evidence presented at trial.

Trial Court Opinion, 12/23/2014, at 17-19 (record citations omitted).

We agree with the court's well-reasoned analysis. Rice fails to explain in what manner the trial court abused its discretion in denying his weight claim. Rather, his argument consists largely of attacks on the credibility of Johnson and the nature of the injuries. As such, he asks this Court to reweigh the evidence; however, we decline to do so. As our Supreme Court has made clear, we may not reweigh the evidence and substitute our judgment for the trial court's decision. **See Lyons**, **supra**. Therefore, Rice's weight claim fails.

In Rice's third issue, he argues the trial court gave in an improper jury instruction to the jury. He points to the instructional jury statement: "You should not regard as true any evidence which you find to be incredible, even if it is uncontradicted." N.T., 2/5/2013, at 39. Rice complains:

This instruction told the jury that it was improper for them to determine that evidence they may perceive as true to be true if the evidence was not credible or believable. Essentially the jurors were told that they could not decide a fact was true, even if they believed it to be true, if the evidence was untrue and un-contradicted. Such a charge prohibited the jury from drawing its own determination from the fact presented during the trial.

…

The court's instruction usurped the jury's fact-finding role and prejudiced [Rice] where they are told that they cannot regard a fact it believed to be true as true.

Rice's Brief at 28 (citations omitted).

Our standard of review in assessing a trial court's jury instructions is as follows:

[W]hen evaluating the propriety of jury instructions, this Court will look to the instructions as a whole, and not simply isolated portions, to determine if the instructions were improper. We further note that, it is an unquestionable maxim of law in this Commonwealth that a trial court has broad discretion in phrasing its instructions, and may choose its own wording so long as the law is clearly, adequately, and accurately presented to the jury for its consideration. Only where there is an abuse of discretion or an inaccurate statement of the law is there reversible error.

*Commonwealth v. Trippett*, 2007 PA Super 260, 932 A.2d 188, 200 (Pa. Super. 2007) (*quoting* ***Commonwealth v. Kerrigan***, 2007 PA Super 63, 920 A.2d 190, 198 (Pa. Super. 2007)).

*Commonwealth v. Antidormi*, 84 A.3d 736, 754 (Pa. Super. 2014).

Here, the trial court found this issue was waived for failing to properly preserve an objection. Specifically, the court stated:

In the instant case, neither [Rice], nor his counsel, took exception (in the form of a general or specific objection) to any

- 20 -

of the language in the Court's charge, including the alleged improper language above, before the jury deliberated. *See* (N.T. 02/05/13 at 73 ("[THE COURT]: I saw now confer with counsel and ask for any suggestions they may have with respect to my charge. Does counsel have any suggestion? MS. WEAVER [attorney for [Rice]]: No, Your Honor.") (emphasis added). Therefore, [Rice] has waived this issue on appeal.

Trial Court Opinion, 12/23/2014, at 33.[6]

After reviewing the jury instructions, we agree with the court's finding that Rice has waived this issue. ***See*** Pa.R.A.P. 302(b) ("[a] general exception to the charge to the jury will not preserve an issue for appeal. Specific exception shall be taken to the language or omission complained of"); ***see also*** Pa.R.Crim.P. 647 ("[n]o portions of the charge nor omissions therefrom may be assigned as error, unless specific objections are made thereto before the jury retires to deliberate"); ***Commonwealth v. Dorm***, 971 A.2d 1284, 1288 (Pa. Super. 2009) ("failure to lodge an objection to jury instructions before the jury deliberates waives the objection");

_____

[6] The court also noted the statement was not made in a vacuum and that the court also stated during the charge:

(1) "As judges of the facts *you are the sole judges of credibility* of the witnesses and their testimony. This means that you must judge the truthfulness and accuracy of each witnesses' [sic] testimony. And you must decide whether you believe all, part or none of their testimony[" (N.T. 02/05/13 at 43)] (emphasis added); and (2) "*As sole judges of the credibility* and facts, you the jurors are responsible to give the testimony of every witness and all other evidence whatever credibility and weight that you think it deserves." (*Id.* at 45-46) (emphasis added).

Trial Court Opinion, 12/23/2014, at 33 n.1 (italics in original).

- 21 -

*Commonwealth v. Edmondson*, 718 A.2d 751, 753 (Pa. 1998) ("Requiring a timely, specific objection to be lodged in the trial court ensures that the trial judge has a chance to correct alleged trial errors and eliminates the possibility that the appellate court will be required to expend time and energy reviewing points on which no trial ruling has been made.").[7] Accordingly, we need not address this claim further.

Lastly, Rice challenges the discretionary aspects of his sentence. Specifically, he states his sentence is in excess of the sentencing guideline recommendations, and the court failed to consider the following circumstances when imposing the sentence:

> 1) [Rice] had a prior record score of zero; 2) he obtained his high school diploma ahead of his anticipated date of graduation and received it 6-7 months prior [to] his scheduled date for graduation; 3) [Rice] had numerous people who appeared in court in support of him; 4) [Rice] had a higher potential for rehabilitation; 5) [Rice] was viewed as bright and intelligent with great potential; 6) his age reduced his risk to society due to his high probability of reform; that he was scheduled to take his SAT before his arrest; that he had already made arrangements to enter the Army upon graduation[;] and 7) [Rice] allegedly acted in response, albeit inappropriately, to allegedly being shot by the Complainant, Ladson.

_____

[7] We also note that even if this issue was not waived, Rice misinterprets and conflates the charge in his argument. As explained above, the charge actually instructs the jury that they do not have to believe something just because it is uncontradicted. Therefore, his argument would be meritless.

Rice's Brief at 24. Rice also points out that he demonstrated remorse for the victims and "has developed a totally different outlook on life." ***Id.*** (record citation omitted).

Rice also asserts the court failed to consider certain statutory factors under 42 Pa.C.S. § 9712. ***Id.*** at 26. He states the court did not show it used a balance approach in determining an appropriate sentence, and the victims did not appear at court and did not provide an impact statement. ***Id.*** Rice argues that as a result, the court "focused on the nature of the offense and who the victims were." ***Id.*** Additionally, Rice states the court failed to consider that "the shooters aimed at the feet and legs of the victims rather than vital [body] parts such as the chest, head or abdomen areas." ***Id.*** Rice concludes he "received a manifestly excessive aggregate sentence, and such a sentence constituted an abuse of discretion." ***Id.***

The standard of review for a claim challenging a discretionary aspect of sentencing is well-established:

> Sentencing is a matter vested in the sound discretion of the judge, and will not be disturbed on appeal absent a manifest abuse of discretion. An abuse of discretion is not shown merely by an error in judgment. Rather, the appellant must establish, by reference to the record, that the sentencing court ignored or misapplied the law, exercised its judgment for reasons of partiality, prejudice, bias or ill will, or arrived at a manifestly unreasonable decision.

***Commonwealth v. Sheller***, 961 A.2d 187, 190 (Pa. Super. 2008) (citation omitted), *appeal denied*, 980 A.2d 607 (Pa. 2009).

"A challenge to the discretionary aspects of a sentence must be considered a petition for permission to appeal, as the right to pursue such a claim is not absolute." **Commonwealth v. Hoch**, 936 A.2d 515, 518 (Pa. Super. 2007) (citations and quotation marks omitted). To reach the merits of a discretionary issue, this Court must determine:

> (1) whether appellant has filed a timely notice of appeal; (2) whether the issue was properly preserved at sentencing or in a motion to reconsider and modify sentence; (3) whether appellant's brief has a fatal defect; and (4) whether there is a substantial question that the sentence appealed from is not appropriate under the Sentencing Code.

**Commonwealth v. Dunphy**, 20 A.3d 1215, 1220 (Pa. Super. 2011) (footnotes omitted).

Here, Rice filed a notice of appeal, preserved the issue in a post-sentence motion, and included the requisite statement pursuant to Pa.R.A.P. 2119(f) in his appellate brief. Therefore, we may proceed to determine whether Rice has presented a substantial question that the sentence appealed from is not appropriate under the Sentencing Code. **Commonwealth v. Edwards**, 71 A.3d 323, 330 (Pa. Super. 2013), *appeal denied*, 81 A.3d 75 (Pa. 2013).[8]

---

[8] With respect to whether an issue presents a substantial question, we are guided by the following:

> The determination of what constitutes a substantial question must be evaluated on a case-by-case basis. **See Commonwealth v. Paul**, 2007 PA Super 134, 925 A.2d 825

*(Footnote Continued Next Page)*

To the extent Rice puts forth the assertion that his sentence was excessive because the trial court failed to properly consider mitigating factors, such an allegation does not raise a substantial question. *See Commonwealth v. Moury*, 992 A.2d 162, 171 (Pa. Super. 2010).

To the extent Rice argues his sentence was "manifestly excessive," such a claim does raise a substantial question. "[A] defendant may raise a substantial question where he receives consecutive sentences within the guideline ranges if the case involves circumstances where the application of the guidelines would be clearly unreasonable, resulting in an excessive sentence; however, a bald claim of excessiveness due to the consecutive nature of a sentence will not raise a substantial question." *Commonwealth v. Dodge*, 77 A.3d 1263, 1270 (Pa. Super. 2013), *appeal denied*, 91 A.3d 161 (Pa. 2014) (emphasis in original); *see also Commonwealth v. Kelly*, 33 A.3d 638, 640 (Pa. Super. 2011) ("A claim that a sentence is manifestly

*(Footnote Continued)* —————

(Pa. Super. 2007). "A substantial question exits only when the appellant advances a colorable argument that the sentencing judge's actions were either: (1) inconsistent with a specific provision of the Sentencing Code; or (2) contrary to the fundamental norms which underlie the sentencing process." *Commonwealth v. Griffin*, 2013 PA Super 70, 65 A.3d 932, 2013 WL 1313089, *2 (Pa. Super. filed 4/2/13) (quotation and quotation marks omitted).

*Edwards*, 71 A.3d at 330 (citation omitted).

excessive such that it constitutes too severe a punishment raises a substantial question.").

We note that when imposing a sentence, the sentencing court must consider "the protection of the public, the gravity of the offense as it relates to the impact on the life of the victim and on the community, and the rehabilitative needs of the defendant." 42 Pa.C.S. § 9721(b). Moreover,

> "[w]hen imposing a sentence, a court is required to consider the particular circumstances of the offense and the character of the defendant." *Commonwealth v. Griffin*, 804 A.2d 1, 10 (Pa. Super. 2002), *appeal denied,* 582 Pa. 671, 868 A.2d 1198 (2005), *cert. denied,* 545 U.S. 1148, 125 S.Ct. 2984, 162 L.Ed.2d 902 (2005). "In particular, the court should refer to the defendant's prior criminal record, his age, personal characteristics and his potential for rehabilitation." *Id.* Where the sentencing court had the benefit of a presentence investigation report ("PSI"), we can assume the sentencing court "was aware of relevant information regarding the defendant's character and weighed those considerations along with mitigating statutory factors." *Commonwealth v. Devers*, 519 Pa. 88, 101-02, 546 A.2d 12, 18 (1988). *See also Commonwealth v. Tirado*, 870 A.2d 362, 368 (Pa. Super. 2005) (stating if sentencing court has benefit of PSI, law expects court was aware of relevant information regarding defendant's character and weighed those considerations along with any mitigating factors). Further, where a sentence is within the standard range of the guidelines, Pennsylvania law views the sentence as appropriate under the Sentencing Code. *See Commonwealth v. Cruz-Centeno*, 447 Pa.Super. 98, 668 A.2d 536 (1995), *appeal denied,* 544 Pa. 653, 676 A.2d 1195 (1996) (stating combination of PSI and standard range sentence, absent more, cannot be considered excessive or unreasonable).

*Moury*, 992 A.2d at 171.

Here, the trial court had the benefit of a presentence investigation report,[9] and therefore, we will presume it was "aware of all appropriate sentencing factors and considerations." ***Commonwealth v. Downing***, 990 A.2d 788, 794 (Pa. Super. 2010) (citation omitted).[10] Furthermore, as will be discussed below, the trial court adhered to the standard range of the sentencing guidelines. Appellate review with respect to a sentence within the guidelines is whether the sentence is "clearly unreasonable." 42 Pa.C.S. 9781(c)(2).

Here, the trial court found the following:

All of the sentences that this Court imposed were within the prescribed statutory limits.[20] Indeed, all of the sentences were within the standard range provided in the Sentencing Guidelines and it is of no consequence that this Court imposed four consecutive, rather than concurrent, sentences of seven (7) to fourteen (14) years for each conviction of Attempted Murder, as well as a consecutive sentence of two (2) to four (4) years incarceration for Firearms Not to Be Carried Without a License.[21]

> [20] The maximum sentence for a conviction of one count of Attempted Homicide is forty (40) years where serious bodily injury results. The maximum sentence for a conviction of one count of Conspiracy to Commit Homicide is forty (40) years where serious bodily injury results. The maximum sentence for one count of Firearms Not to Be Carried Without a License, a felony of the third degree, is seven (7) years. Here, [Rice], who was sentenced to four counts of Attempted Homicide, one count of Conspiracy to

---

[9] N.T., 5/24/2013, at 35.

[10] Although the pre-sentence investigation report was not included in the certified record, Rice has not challenged the accuracy of the information contained in the document.

Commit Homicide, and one count of Firearms Not to Be Carried Without a License, was only given an aggregate sentence of thirty (30) to (60) years of incarceration, far below the maximum allowable sentence (based only on those counts and not his remaining convictions) of two-hundred and seven (207) years.

[21] [Rice]'s prior record score in this case was zero. For a conviction of either Attempted Homicide, where serious bodily injury results, or Conspiracy to Commit Homicide, where serious bodily injury results, the offense gravity score is fourteen (14). 204 Pa.Code § 303.3(c)(4). When such an offense is committed with a deadly weapon, as it was here, the Sentencing Guidelines recommended a sentence of ninety (90) months to the statutory limit, which is forty (40) years, plus or minus twelve months. For a conviction of Firearms Not to Be Carried Without a License, where the firearm is loaded, the offense gravity score is nine (9), and the Sentencing Guidelines recommended a minimum sentence of twelve (12) to twenty-four (24) months incarceration, plus or minus twelve (12) months. Here, because the Court sentenced [Rice] to, at a minimum, seven (7) years or eighty-four (84) months of incarceration for each sentenced count of Attempted Homicide and Conspiracy to Commit Homicide, and to a consecutive sentence of a minimum of twenty-four (24) months incarceration for Firearms Not to Be Carried Without a License, each sentence is squarely within the recommended range of the Guidelines.

Moreover, this Court took into account the particular circumstances of the offenses and character of [Rice], and weighed the gravity of the offenses, the rehabilitative needs of [Rice], the need to protect the community, as well as the impact of the offenses on [Rice]'s victims. (N.T. 05/24/13 at 35-42). The impact on the victims in the case is undoubtedly serious and tragic. As a result of [Rice]'s senseless and heinous actions, each of [his] victims were hospitalized, two of the victims had to undergo surgery, and two of the victims suffered broken bones in their legs and feet. One victim, Ms. Lane, had her leg placed in a cast, was required to use crutches and a walker, and continued (up to her testimony at trial) to feel agonizing pain in her feet, as if her wound would reopen anytime that she showered. Additionally, one of the victims, six-year old Denean,

already suffering from brain cancer, had to spend some of her final months on earth recovering from the surgery that removed a bullet out of her leg.

There can also be no doubt that [Rice] is a danger to the community and a person who is in need of rehabilitation. Just three weeks prior to the heinous shooting in this case, [Rice] incurred two gunshot wounds, underwent surgery, and had to be prescribed heavy pain killers. As he stated at his sentence, "I [the defendant] know what it's like to be shot, so I wouldn't wish that on nobody." (N.T. 05/24/13 at 22). Nethertheless, despite the fresh personal knowledge of the pain incurred from a gunshot wound, [Rice] still decided to openly fire multiple rounds of a semi-automatic handgun at a defenseless family in the middle of the street. Given the circumstances, a sentence of a minimum of *only* thirty years, allowing [Rice] to potentially reenter society in his late forties is not "grossly excessive;" its merciful. (N.T. 05/24/13 at 34-38).

Trial Court Opinion, 12/23/2014, at 22-24 (citation and some record citations omitted).

Based on the testimony presented at the sentencing hearing, the court articulated the gravity as well as the nature and circumstances of the offenses in addition to its concern for the protection of the community. The court indicated it had the benefit of the presentence investigation, had reviewed the sentencing guidelines,[11] and had listened to Rice's own statements.[12] Accordingly, considering all the attendant circumstances, we detect no abuse of discretion on the part of the trial court in imposing Rice's sentence. Therefore, his final argument also fails.

___

[11] N.T., 5/24/2013, at 35.
[12] *Id.* at 21-23.

Judgment of sentence affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 1/20/2016